# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRI MCGUIRE MOLLICA,** | ] | |
| | ] | |
| **Petitioner,** | ] | **Civil Action No.** |
| | ] | **2:17-CV-8038-KOB** |
| **v.** | ] | |
| | ] | **Associated Criminal Case** |
| **UNITED STATES OF AMERICA,** | ] | **2:14-CR-329-KOB** |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

This matter comes before the court on Petitioner Terri Mollica's *pro se*
motion to vacate, set aside, or correct her sentence under 28 U.S.C. § 2255. (Doc.
1). Ms. Mollica, a federal prisoner who pled guilty to fraud, money laundering,
aggravated identity theft, and filing false tax returns, timely filed her motion. In
her petition, she raises an eclectic collection of approximately 44 grounds or claims
for relief.

Several of Ms. Mollica's claims attack the sentencing consequences of
separate crimes she committed while on pre-trial release. Her ongoing criminal
activity violated her plea agreement with the government, increased her advisory
guideline range, and factored significantly into the court's sentencing decision.
But Ms. Mollica's claims reveal that she blames everyone except herself for the
ramifications of her conduct.

Her claims for relief include challenges to whether she entered her guilty plea knowingly and voluntarily; whether her plea agreement is enforceable; whether the court had jurisdiction to convict her; whether her retained counsel provided constitutionally adequate assistance; and whether the court correctly determined her advisory guideline range and her sentence. Ms. Mollica further elaborates on some of her allegations, but many allegations remain conclusory in nature, in a pleading that she titled "Reply and Amended Petition to Response." (Doc. 11).

For the reasons stated below, the court will DISMISS Ms. Mollica's § 2255 motion. After reviewing the course of Ms. Mollica's criminal proceedings and the facts underlying her convictions, the court addresses in turn each of Ms. Mollica's 44 claims, as well as her arguments from her reply pleading. The court concludes that Ms. Mollica knowingly and voluntarily pled guilty and that she received constitutionally adequate counsel. Ms. Mollica's valid guilty plea and her plea agreement's collateral-attack waiver require the court to dismiss most of Ms. Mollica's substantive claims challenging her conviction and sentence; even if the waiver were somehow ineffective, those claims otherwise lack merit.

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. <u>Indictment and Written Plea Agreement</u>

A grand jury charged Ms. Mollica with 21 counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1–21); 25 counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 22–55 and 75–76); 18 counts of money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (Counts 56–74); 1 count of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 77); and 5 counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts 78–82). (2:14-cr-00329-KOB, "Crim. Doc.," Doc. 1).

Ms. Mollica retained attorneys James Parkman and William White to represent her in her criminal case.

In a written plea agreement, Ms. Mollica agreed to plead guilty to 6 counts of wire fraud; 9 counts of mail fraud; 5 counts of money laundering; 1 count of aggravated identity theft; and 4 counts of filing a false tax return. (Crim. Doc. 25 at 1). In exchange for her guilty plea, the government agreed to dismiss the remaining 57 charges.

The government also agreed to recommend that the court award Ms. Mollica the full three-level acceptance-of-responsibility reduction of her advisory guideline range and to recommend that the court impose a total sentence at the low end of

her advisory guideline range: not more than 10 years' imprisonment followed by the 2-year mandatory consecutive sentence for aggravated identity theft. (Crim. Doc. 25 at 19). So the maximum sentence the government would have recommended under the plea agreement was 12 years' imprisonment. The government also agreed to recommend that the court impose a supervised-release sentence of 5 years. (*Id.*).

But the government's sentencing agreement included conditions on Ms. Mollica's conduct prior to sentencing. The plea agreement released the government from its promise to recommend the lower sentence *if* Ms. Mollica "violate[d] any condition of pretrial release or violate[d] any federal, state, or local law, or should [she] say or do something that is inconsistent with acceptance of responsibility." (Crim. Doc. 25 at 23).

The plea agreement also included waivers of Ms. Mollica's rights to appeal her sentence and to bring post-conviction collateral attacks under § 2255. Those waivers encompassed Ms. Mollica's rights to challenge her convictions and sentences as well as her rights to challenge any fines, restitution, or forfeiture orders. (Crim. Doc. 25 at 20). The plea agreement *excluded* from the waivers only three limited types of claims: (1) those involving sentences imposed above the statutory maximum; (2) those involving sentences imposed above the guideline

range determined by the court at the time of sentencing; and (3) those involving the effectiveness of counsel. (Crim. Doc. 25 at 21). Ms. Mollica signed below the waiver section to "signify that [she] fully [understood] the foregoing paragraphs, and that [she was] knowingly and voluntarily entering into this waiver." (*Id.* at 22).

The written plea agreement provided several notices to Ms. Mollica. It noted the statutory minimum and maximum sentences for the offenses to which she agreed to plead guilty, including the relevant maximum supervised-release terms. (Crim. Doc. 25 at 2–6). Ms. Mollica signed the plea agreement acknowledging the minimum and maximum sentences. (*Id.* at 6).

On April 10, 2015, Ms. Mollica also signed below the "Defendant's Understanding" section at the end of the plea agreement. (Crim. Doc. 25 at 31). By doing so, Ms. Mollica signified that she read and understood all 32 pages of the plea agreement, discussed the case and her rights with counsel, was satisfied with her counsel's representation, understood the rights that she waived by pleading guilty, personally and voluntarily initialed each page of the agreement, and approved *all* provisions of the plea agreement. (*Id.* at 30–31).

### B.  Facts of Convictions

By signing the "Factual Basis for Plea" section of her written plea

agreement, Ms. Mollica stipulated to the following facts relevant to her crimes and her plea of guilty.  (Doc. 25 at 16).

Prior to the charges brought in her criminal case, Ms. Mollica acted as a Chief Financial Officer overseeing the finances of two charitable organizations: Birmingham Health Care ("BHC"), and Central Alabama Comprehensive Health ("CACH").  Both organizations received money from the United States Department of Health and Human Services' Health Resources & Services Administration ("HRSA") in the form of grants.  (Crim. Doc. 25 at 8).

In 2008, Ms. Mollica left that position alongside the charities' Chief Executive Officer, "J.D.," to work at a new set of corporations called Synergy. But Ms. Mollica and J.D. retained control over BHC and CACH via the Synergy corporations.  The two charities entered into agreements with Synergy to, in effect, funnel money and other assets from the charities to Synergy.  Ms. Mollica's crimes arose from her concealment of this information from HRSA to ensure that it would continue to provide grant funds to the charities.  (Crim. Doc. 25 at 8–9).

Furthermore, BHC used "only a fraction" of the grant money for the activities for which it received the funds.  Instead, Ms. Mollica—along with others—stole much of the grant money as well as BHC's other assets.

For example, in 2008, Synergy bought a property from BHC; Synergy

subsequently leased that same building back to BHC at a rate "several thousand dollars more per month" than BHC's prior mortgage payments on the property. Ms. Mollica also used BHC's assets—including federal grant funds—to finance Synergy's purchase of another property in Birmingham. (Crim. Doc. 25 at 10).

Ms. Mollica personally participated "in over 200 transactions to enrich herself," and, from January 2008 to March 2012, Ms. Mollica and her confederates transferred over $11,000,000 in money, assets, and property from BHC and CACH to Synergy. (Crim. Doc. 25 at 11). She personally received $1,747,064.04 and laundered $214,333.19. (*Id.* at 13).

### C. Plea Colloquy

On April 27, 2015, this court held a hearing regarding Ms. Mollica's proposed guilty plea. (Crim. Doc. 49). The court placed Ms. Mollica under oath, explaining to her that any answers to the court's questions "must be full, complete, and true because a false answer or false statement made under oath could be the basis for prosecuting [her] for perjury." (*Id.* at 2). Ms. Mollica confirmed that she understood the court. (*Id.*)

The court asked Ms. Mollica whether she had taken any kind of drugs or medications in the preceding 72 hours. Ms. Mollica answered that she was taking some medications for depression, anxiety, and blood pressure, but confirmed that

the medications did not affect her ability to understand and respond to the court's questions. (Crim. Doc. 49 at 3). Ms. Mollica also confirmed that she did not have any mental impairment that affected her ability to understand and respond to the court's questions. (*Id.*). The court also told Ms. Mollica about the importance of her understanding everything said at the plea colloquy, and the court requested that Ms. Mollica interrupt the proceedings and tell the court if she did not understand something. (*Id.*). She agreed to do so and that if she did not, the court could properly assume that she in fact fully understood what was said and took place. (*Id.* at 3–4).

The court explained some of the plea agreement's terms and it observed that, by entering into the plea agreement, Ms. Mollica would waive her rights to appeal or collaterally challenge her sentence. (Crim. Doc. 49 at 11–12). Ms. Mollica confirmed that she understood the terms, that she discussed them with counsel, and that she knew the waiver would be enforceable against her. (*Id.* at 11–13). Ms. Mollica confirmed that she had no questions about the waiver or its effect on her and that she had signed the plea agreement. (*Id.* at 12–13). She also confirmed that no one had promised or threatened her to get her to plead guilty. (*Id.* at 14).

The court outlined each group of charges brought against Ms. Mollica, and Ms. Mollica confirmed that she understood the charges as stated. (Crim. Doc. 49

at 23–32).  Ms. Mollica also confirmed that she had sufficient time to discuss the charges with her retained attorneys and that she was satisfied with counsel.  (*Id.* at 32).  Ms. Mollica's attorney likewise stated that he was satisfied that she understood the charges against her.  (*Id.*).

Ms. Mollica agreed that the plea agreement accurately recounted the factual basis for the charges.  (Crim. Doc. 49 at 34–35).  She also agreed that the court could use the facts stated in the plea agreement to craft an appropriate sentence.  (*Id.*).

Ms. Mollica verbally pled guilty, admitting that she had committed wire fraud, mail fraud, money laundering, aggravated identity theft, and the filing of false tax returns.  Based on Ms. Mollica's under-oath answers to its questions, the court found that Ms. Mollica made her guilty plea knowingly, voluntarily, and freely, and that the requisite factual basis for the plea existed.  (Crim. Doc. 49 at 36–38).

### D.    Presence Investigation Report

A probation officer prepared a presentence investigation report ("PSR") for Ms. Mollica.  Using the 2014 Guidelines Manual, Ms. Mollica's final adjusted guideline offense level was 40 and her criminal-history category was I.  The overall scheme caused a loss of $11,000,000, requiring a 20-level offense level

enhancement under U.S.S.G. § 2B1.1(b)(1)(K).  The PSR also included guideline range enhancements for committing an offense involving a government health care program, U.S.S.G. § 2B1.1(b)(7)(i); misrepresenting that she was acting on behalf of a charitable organization, U.S.S.G. § 2B1.1(b)(9); using sophisticated means, U.S.S.G. § 2B1.1(b)(10)(C); abusing the public trust, U.S.S.G. § 3B1.3; supervising or managing criminal activity involving five or more participants, U.S.S.G. § 3B1.1(b); and obstructing justice, U.S.S.G. § 3C1.1.  (PSR at ¶¶ 77–85).

The PSR did not include a reduction for acceptance of responsibility, but instead included a sentencing enhancement based on obstruction of justice because of the bizarre criminal scheme Ms. Mollica targeted at persons involved in investigating and prosecuting her case.

As part of her targeting scheme, on October 17, 2014, two weeks before the grand jury returned her indictment, Ms. Mollica mailed "thank you" cards and $250 gift cards to the home of the lead FBI agent investigating her case and to the home of the AUSA prosecuting her case.  Then, in April 2015, after she signed her plea agreement, she reported to the U.S. Department of Justice and the Shelby County Sheriff that the FBI agent and the AUSA stole cash and gift cards from her. (PSR at ¶¶ 70–71).

And, around the time of her plea hearing in April 2015, and after she signed her plea agreement, Ms. Mollica mailed a set of digital scales to the home of her co-conspirator who was a cooperating witness for the government. She then mailed a package containing Valium, Ambien, and other unidentified pills to the co-conspirator's home. The drugs arrived at the home on April 27, 2015, the day of Ms. Mollica's plea hearing, and the scales had arrived a few days earlier. (PSR at ¶ 69).

As another part of her scheme, around the time of Ms. Mollica's plea hearing in April 2015, and after she signed her plea agreement, she mailed a package containing amphetamine and methylphenidate tablets and two $250 gift cards to the AUSA's spouse's office where he worked as a law professor. The package was delivered on April 28, 2015, but, on April 27, 2015, the day of Ms. Mollica's plea hearing, law enforcement received an anonymous online tip that the AUSA's spouse was distributing drugs to his students. After a brief investigation, school officials immediately determined the accusations to be false. (PSR at ¶ 68).

Ms. Mollica's outlandish scheme ultimately caught up with her. On July 23, 2015, Ms. Mollica pled guilty to the "knowing or intentional use of a communication facility to distribute controlled substances" before Judge Hopkins in case no. 15-cr-224 in the Northern District of Alabama. On October 15, 2015,

Judge Hopkins sentenced Ms. Mollica to 28 months' imprisonment, 14 months to run concurrently and 14 months to run consecutively to this court's ultimate sentence. (PSR at ¶ 109).

### E. Sentencing Hearing

The court conducted Ms. Mollica's sentencing hearing on August 9, 2016. (Crim. Doc. 89). At the beginning of the sentencing hearing, Ms. Mollica's counsel asserted that the court should not permit the government to break its promise to recommend a sentence at the low end of the advisory guideline range based on Ms. Mollica's criminal conduct while on pre-trial release. Ms. Mollica's counsel appeared to assert that, if it failed to make those recommendations, the government would void the plea agreement. (*Id.* at 7–8).

In response to counsel's argument, this court observed, hypothetically, that voiding the plea agreement would likewise void Ms. Mollica's guilty plea, and the case would then have to be set for trial on all of the charges, including those that the government had agreed to dismiss as part of the plea bargain. After discussing the matter with Ms. Mollica, counsel declined to pursue any withdrawal of Ms. Mollica's guilty plea. (Crim. Doc. 89 at 8–12).

The court then addressed Ms. Mollica's objections to the presentence report. She filed several objections (*see* Crim. Doc. 34), but then withdrew all of her

objections except for her objection to the guideline enhancement for obstruction of justice and the denial of a reduction for acceptance of responsibility. (Crim. Doc. 89 at 12).

As to her objection to the obstruction of justice enhancement, Ms. Mollica urged the court to ignore her separate crime—the knowing or intentional use of a communication facility to distribute controlled substances—committed while on pre-trial release in this case. (Crim. Doc. 34 at 4–6). She argued that her separate crime "does not have any bearing on an appropriate sentence in this case and is only intended to influence and improperly prejudice [her] at sentencing." (*Id.*). And she asserted that because she pled guilty in this case before she pled guilty to her separate crime, she never "formed the specific intent to obstruct any proceedings" in this case "as all that was left to do was sentencing." (*Id.* at 7).

At sentencing, Ms. Mollica's counsel elaborated that "the obstruction really had nothing to do with this particular case" because she had already pled guilty "at the time that the other acts took place that warranted the [other] conviction. There may have been a few acts that may have begun before that but nothing like the acts that occurred after that, after the time that she entered the plea." (Crim. Doc. 89 at 16–17).

The court was not convinced. At sentencing, the court explained that Ms.

Mollica's acts of obstruction of justice targeted the AUSA and the FBI Agent on her case and their families.  (Crim. Doc. 89 at 17).  The court told Ms. Mollica's counsel that, "to argue in this case that she should not be held accountable for her actions of intimidation, at the very least, of the key people who are prosecuting her here . . . runs completely afoul of the guideline requirements that it be considered in sentencing in this case." (*Id.* at 18).  The court overruled Ms. Mollica's objection to the obstruction of justice enhancement, but took into account the fact that Judge Hopkins had already sentenced Ms. Mollica for at least a part of the acts of obstruction of justice.  (*Id.*).

As to her objection to the denial of a reduction for acceptance of responsibility, Ms. Mollica contended that she accepted responsibility because she voluntarily "pled guilty to charges in this case and freely admitted her wrongdoing and actions," resigned from BHC and Synergy, and paid restitution.  (Crim. Doc. 34 at 8).  She argued also that the PSR improperly used the obstruction of justice enhancement as the basis for denying a reduction for acceptance of responsibility. And she claimed that she saved this court and the government from a costly and lengthy trial by pleading guilty.  At sentencing, Ms. Mollica's counsel added that the written plea agreement acknowledged that Ms. Mollica provided substantial assistance to the government.  (Crim. Doc. 89 at 22–23).

Again, the court was not convinced. At sentencing, the court stated that Ms. Mollica's case was not the "extremely rare" and "extraordinary case where someone is involved in obstruction of justice" and "would still receive a reduction for acceptance of responsibility." (Crim. Doc. 89 at 24). The court explained that Ms. Mollica's conduct did *not* save the court and the government time and effort; instead, "it resulted in a separate offense being filed and the court resources being used to handle that plea and sentencing and all the other things that went along with it, as well as the government's involvement" in the separate case involving her efforts to intimidate and/or frame her adversaries. (*Id.*).

The court noted that, although Ms. Mollica resigned her employment, she did not report the criminal enterprise to law enforcement and "allowed that raping of those entities and the stealing of government money to continue" for at least two years. (Crim. Doc. 89 at 25). The court found that "many things in Ms. Mollica's conduct before and after she stood in front of [the court] and entered a plea of guilty . . . negate[d] her entitlement to acceptance of responsibility" and overruled her objection. (*Id.* at 26).

After overruling Ms. Mollica's objections, the court adopted the PSR's recommendations and found that Ms. Mollica's guideline offense level was 40, her criminal-history category was I, and her advisory guideline range was 292 to 365

months' imprisonment.  (Crim. Doc. 89 at 27).  In addition, Ms. Mollica's aggravated identity theft conviction to which she pled required a mandatory consecutive sentence of 24 months.  (*Id.*).

After raising challenges to various aspects of the court's calculation of her advisory guideline range, Ms. Mollica argued for a sentence below the guideline range calculated and adopted by the court.  (Crim. Doc. 89 at 28–44).  In that argument, counsel pointed out that Ms. Mollica had a traumatic upbringing, suffered from depression, and required psychiatric help.  (*Id.* at 36).  Counsel also addressed Ms. Mollica's questionable mental stability as a factor warranting a downward variance.  (*Id.* at 37).  And counsel urged the court to consider how Ms. Mollica only personally received $1.7 million of the approximately $11 million loss caused by the fraud.  (*Id.* at 32–35).

Before imposing sentence, the court offered to allow Ms. Mollica to speak on her own behalf.  Ms. Mollica declined the opportunity.  (Crim. Doc. 89 at 44).

Although it maintained that Ms. Mollica did not deserve an acceptance of responsibility reduction, the government asserted that Ms. Mollica's conduct warranted a sentence at the low end of the guideline range as calculated in the PSR—292 months for the fraud charges followed by 24 months for the aggravated identity theft offense—a 316-month total sentence.  (Crim. Doc. 89 at 79).

In fashioning its sentence, the court observed that the government would have recommended 144 months' total imprisonment had Ms. Mollica complied with the conditions in her plea agreement, instead of the 316 months it recommended at sentencing. (Crim. Doc. 89 at 83). After ruminating on several possible ways to arrive at an appropriate sentence, the court found a 17-year or 204-month total sentence to be reasonable given all of Ms. Mollica's conduct—pre- and post-indictment. (*Id.* at 86). The court divided that total sentence into 180-month sentences, all concurrent, as to the fraud, money laundering, and false tax return convictions, with 24 months' imprisonment running consecutive to those sentences for the aggravated identity theft conviction. (*Id.* at 86–87). And the court acknowledged that 14 months of Judge Hopkins's 28-month sentence would run concurrently with the court's sentence, and the remaining 14 months would run consecutively. (*Id.* at 15–16).

The court observed that the sentence was five years longer than the sentence the government would have recommended had Ms. Mollica complied with the plea agreement, but still seven years below the low end of the ultimate guideline range. (Crim. Doc. 89 at 86). Finally, the court noted that it would have imposed the same sentence regardless of how it had resolved the guidelines issues raised by Ms. Mollica. (*Id.* at 89). On the government's motion, the court dismissed the 57

charges to which Ms. Mollica had not pled guilty.  (Doc. 64).

Ms. Mollica did not appeal her convictions or sentences.  And she has not filed any previous § 2255 motions.

## II.    DISCUSSION

Through this § 2255 motion, Ms. Mollica collaterally attacks her convictions and sentences.  A federal prisoner may move the court that imposed sentence to vacate, set aside, or correct her sentence if the court imposed her sentence in violation of the Constitution or federal law, without proper jurisdiction, or in excess of the maximum authorized by law, or if the sentence is otherwise subject to collateral attack.  28 U.S.C. § 2255.

As previously noted, Ms. Mollica raises approximately 44 claims in her § 2255 motion.  In her reply pleading, Ms. Mollica reframes and elaborates on some of those claims.  (Doc. 11).  Although a petitioner generally may not add new claims for relief in a reply pleading, *see Farris v. United States*, 333 F.3d 1211, 1215 (11th Cir. 2003), the court will consider the issues that Ms. Mollica raises in her reply to provide her with the maximum opportunity to have her claims addressed on their merits.

The court will proceed methodically through Ms. Mollica's 44 claims and independently address the merits of each claim.

First, the court will deny Ms. Mollica's claim that the court did not specify whether it dismissed the charges to which she did not plead guilty with or without prejudice because the court cannot provide relief on that claim. Second, the court will address Ms. Mollica's constitutional challenge to the court's jurisdiction to sentence her. Third, the court will address Ms. Mollica's claims challenging several circumstances that, according to Ms. Mollica, prevented her from knowingly and voluntarily entering her guilty plea and signing the written plea agreement. Fourth, the court will address Ms. Mollica's single claim that the written plea agreement is unenforceable because the government allegedly breached the agreement. Fifth, the court will address Ms. Mollica's several claims of ineffective assistance of counsel related to her guilty plea, sentencing, and failure to appeal. And, finally, the court will address Ms. Mollica's numerous substantive challenges to her convictions and sentences. In doing so, the court finds that most claims are barred by the collateral-attack waiver in her written plea agreement and otherwise lack merit for the reasons stated below.

## A.     Failure to Dismiss Charges with Prejudice (Claim 9)

In Claim 9, Ms. Mollica asserts that the court, when dismissing the charges to which she did not plead guilty as part of the plea bargain, failed to specify whether it was dismissing the charges with or without prejudice. (Doc. 1 at 13,

Claim 9).  Ms. Mollica does not explain how this claim requests the court to "vacate, set aside or correct" her sentence.  *See* 28 U.S.C. § 2255.

And, though the court did not specifically state that it dismissed the charges with prejudice on the record or on the docket entry for the dismissals, jeopardy attached to the dismissed charges once the court accepted Ms. Mollica's guilty plea on the other charges.  *See United States v. Baggett*, 901 F.2d 1546, 1548 (11th Cir. 1990) (observing that "jeopardy normally attaches when the court unconditionally accepts a guilty plea").  So double jeopardy would prevent the government from bringing those charges again regardless of whether the court used the "magic words."  Ms. Mollica's claim thus is moot, and lacks merit in any event.

The court will DENY Claim 9.

## B.    Jurisdictional Attack (Claim 44)

Ms. Mollica raises a lone jurisdictional attack on her conviction.  She argues that the government did not prove federal jurisdiction over her case because "[t]he crimes alleged in [her] indictment and plea agreement are not encompassed in" Article I, Section 8, Clause 17 of the Constitution.  (Doc. 1 at 18, Claim 44).

Article I, Section 8, Clause 17 provides Congress limited authority:

The Congress shall have Power To . . . exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful buildings.

Unsurprisingly, Section 8 Clause 17 is not the constitutional nexus for Ms. Mollica's mail fraud, wire fraud, tax fraud, aggravated identity theft, or filing false tax returns convictions.  Rather, the Commerce Clause, U.S. Const. Art. 1, Sec. 8, Cl. 3, grants Congress the jurisdiction to legislate the offenses of mail fraud, wire fraud, money laundering, and aggravated identity theft.  *See United States v. Hasner*, 340 F.3d 1261, 1270 (11th Cir. 2003) (finding the mail fraud statute, 18 U.S.C. § 1341, to be a valid exercise of Congress's Commerce Clause power); *United States v. Oliveros*, 275 F.3d 1299, 1303 (11th Cir. 2001) ("[T]he money-laundering statute reaches the full extent of Congress' Commerce Clause power . . . ."); *Pemberton v. United States*, 2014 WL 5112045, at *3 (M.D. Ala. Sept. 24, 2014) ("The commission of wire fraud and identity theft substantially affect interstate commerce, and regulation of such offenses protect the instrumentalities of interstate commerce.  Therefore, 18 U.S.C. §§ 1343 and 1028A(a)(1) are legitimate exercises of Congress's Commerce Clause power . . . .").

And the Taxing and Spending Clause, U.S. Const. Art. 1, Sec. 8, Cl. 1, and the Sixteenth Amendment grant Congress the jurisdiction to legislate the offense of filing a false tax return.  *See United States v. Jensen*, 690 F. Supp. 2d 901, 914 (D. Alaska 2010) ("Article I, Sec. 8 of the United States Constitution . . . as well as the Sixteenth Amendment to the United States Constitution empowers Congress to

create and provide for the administration of an income tax. . . .  The courts have routinely rejected as frivolous a claim that federal jurisdiction does not impose prosecution for . . . filing a false income tax return . . . .").

Congress has well-settled constitutional authority to legislate the criminal offenses of which Ms. Mollica was convicted.  Congressional authority to legislate also gives the U.S. district courts jurisdiction over prosecutions of the violation of those laws.  *See* 18 U.S.C. § 3231.  So, the court had jurisdiction over her prosecution and will DENY Claim 44.

**C.      Attacks on the Knowingness and Voluntariness of Ms. Mollica's Guilty Plea (Claims 2, 7, 11, 35–36, 39–41)**

The court next turns to Ms. Mollica's claims that her guilty plea is invalid because she did not enter her guilty plea knowingly and voluntarily.  The court utilizes its ability to construe pro se pleadings liberally and reads many of her claims premised in part on Federal Rule of Criminal Procedure 11 as constitutionally-based attacks on the knowing and voluntary nature of her plea agreement.  The court's construction of Ms. Mollica's claims in this way has provided her with the maximum opportunity to have her claims addressed on their merits.

By entering a valid guilty plea, a criminal defendant waives most claims related to any alleged deprivation of constitutional rights occurring *before* the entry

of the guilty plea. *United States v. Patti*, 337 F.3d 1317, 1320 (11th Cir. 2003). But as Ms. Mollica does here, a criminal defendant may challenge through a § 2255 motion the validity of her guilty plea and the enforceability of the plea agreement accompanying the guilty plea. *See Patti*, 337 F.3d at 1320.

A guilty plea is invalid if the movant shows that she did not enter the plea knowingly and voluntarily. *See, e.g.*, *Bousley v. United States*, 523 U.S. 614, 621 (1998); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). A criminal defendant entered a guilty plea knowingly and voluntarily if she received real notice of the charges against her, understood the nature of those charges, understood the consequences of the plea, and understood the constitutional rights she waived by entering the plea. *United States v. Frye*, 402 F.3d 1123, 1127 (11th Cir. 2005).

And whether a defendant understood the nature of the charges and entered a guilty plea knowingly depends on her individual sophistication and intelligence. *United States v. Mosley*, 173 F.3d 1318, 1323 (11th Cir. 1999). So, the court will consider Ms. Mollica's sophistication, intelligence, and education—for example, she has a Master's degree in accounting and was a licensed CPA before surrendering her license as part of her plea agreement—in assessing her claims that she did not understand fairly basic and clear aspects of her guilty plea.

With these rules in mind, the court will address Claims 2, 7, 11, 35–36, and

39–41.

## *1. The Court's Failure to Explain Essential Elements (Claim 2)*

Ms. Mollica contends that she did not knowingly enter her guilty plea because the court "failed to elucidate the concept of 'aiding and abetting' in violation of [Federal Rule of Criminal Procedure] 11, in particular the required legal principles to obtain a conviction based on the theory of aiding and abetting." (Doc. 1 at 13, Claim 2).

True, at the plea colloquy, the court did not explain in detail the legal nuances of "aiding and abetting" or specifically note to Ms. Mollica that the indictment charged her with aiding and abetting others. But the court informed her that the indictment stated that others aided and abetted her. (Crim. Doc. 49 at 24, 26–27). And she noted at the plea colloquy that she had discussed the indictment—which identified whom she aided and abetted and how—with counsel in "[a] lot of detail," she confirmed several times that she fully understood the indictment and the terms of the plea agreement, and her counsel stated in an affidavit that he "thoroughly explained" the concept of "aiding and abetting" to her. (Crim. Doc. 49 at 11–15, 20, 23, 25, 28–32; Doc. 9-17 at 1); s*ee Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) ("'[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing,

as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.'") (quoting *Blackledge v. Allison*, 431 U.S. 63, 71 (1977)).

Further, Ms. Mollica failed to raise any concern at the plea colloquy about the meaning of "aiding and abetting," which does not surprise the court given her intelligence and clear ability to understand the meaning of the term on her own and with the assistance of her retained counsel. And, in any event, the term is non-essential to Ms. Mollica's understanding of the various fraud crimes to which she pled guilty. *See United States v. DePace*, 120 F.3d 233, 237 (11th Cir. 1997) ("The degree of complexity added by the aiding and abetting theory is minimal in [the defendant's] case. . . . [W]e hold that, even absent an explicit discussion of aiding and abetting, the district court adequately informed [the defendant] of the nature of the charges.").

The court finds, based on her representations and the court's observations at the plea colloquy, that Ms. Mollica fully understood the charges against her and what the government had to prove. The court will DENY Claim 2.

### 2. *Explanation of the Plea Agreement's Conditions (Claim 7)*

Ms. Mollica asserts that the court and the written plea agreement failed to specify "whether she entered into an unconditional or conditional plea agreement."

(Doc. 1 at 13, Claim 7).  But Ms. Mollica does not explain what she means by a "conditional" or "unconditional" plea agreement.

Construing her claim liberally, the court assumes first that Ms. Mollica asserts that she did not understand that the government conditioned its promise to recommend a sentence at the low end of the guideline range on her remaining in the law's good graces before sentencing.  The plea agreement, however, contains no ambiguity about this condition:

> The defendant understands that *should the defendant violate any condition of pretrial release or violate any federal, state, or local law*, or should the defendant say or do something that is inconsistent with acceptance of responsibility, the United States will no longer be bound by its obligation to make the recommendations set forth in [the § 5K1.1 Motion and Recommended Sentence paragraphs] of the Agreement, but instead, may make any recommendation deemed appropriate by the United States Attorney in her sole discretion.

(Crim. Doc. 25 at ¶ X) (emphasis added).  And, again, when the court asked Ms. Mollica at the plea colloquy if she understood the terms of the plea agreement, she responded that she did.  (Crim. Doc. 49 at 10–11, 13, 23).

Construed most liberally another way, Ms. Mollica's Claim 7 *might* be an assertion that the plea agreement lacked clarity about whether it reserved certain non-jurisdictional defects under Federal Rule of Criminal Procedure 11(a)(2) for appellate and/or collateral review.  But the plea agreement plainly contains no reservation of such a right in its text.

The court's alleged failure to specify whether the plea was "conditional" or "unconditional" bears no relation to the knowingness and voluntariness of Ms. Mollica's plea, and otherwise lacks merit. The court will DENY Claim 7 on these grounds.

### 3.    *Failure to Disclose Exculpatory Evidence (Claim 11)*

Ms. Mollica next claims that she would not have pled guilty if the government had disclosed allegedly-exculpatory statements from a witness, Sheila Parker, that, in Ms. Mollica's view, invalidated her guilty plea. (Doc. 1 at 14, Claim 11). In addition, in her reply pleading, Ms. Mollica contends that Sheila Parker stated that Ms. Mollica "knew nothing of Dunning's or [Sheila Parker's] scheme and had nothing to do with it," and that the government's failure to disclose the statement violated the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material exculpatory evidence. (Doc. 11 at 16). Both arguments fail.

As the court told Ms. Mollica's counsel at sentencing when he seemed to raise the same argument, Sheila Parker's statement that Ms. Mollica did not know about Sheila Parker's scheme does not detract from the offenses to which Ms. Mollica pled guilty. (*See* Crim. Doc. 89 at 6). At sentencing, the court reiterated the offenses to which Ms. Mollica pled guilty, and none required proof of

knowledge of Sheila Parker's scheme:

> [U]nder oath in this courtroom and when she signed her plea agreement she admitted that from in or about January 2008 through in or about March 2012, Mollica, aided and abetted by others, did knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud . . . and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

(Crim. Doc. 89 at 6). So, even assuming that Sheila Parker said what Ms. Mollica claims she said, and assuming that the government withheld the statement, the statement is not relevant to whether Ms. Mollica knowingly and voluntarily pled guilty to the crimes committed by Ms. Mollica.

And Ms. Mollica's claim of a *Brady* violation fails because, even assuming that Sheila Parker's statement is exculpatory evidence, prosecutors do not have to disclose "material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002).

The court finds that Ms. Mollica knowingly and voluntarily entered her guilty plea despite her lack of knowledge of the allegedly withheld evidence. And the government did not commit a *Brady* violation. So the court will DENY Claim 11.

### 4. *Effect of Coercion on the Plea Agreement (Claim 35)*

Ms. Mollica claims that prosecutors threatened her with additional charges if

she did not agree to the plea deal, added "several more counts of unrelated charges" after she rejected the "first plea deal," and attempted to meet with Ms. Mollica without her attorneys' knowledge on two separate occasions. (Doc. 1 at 17, Claim 35). But, at the plea colloquy, the court specifically and directly asked Ms. Mollica, "[h]as anyone promised you anything or threatened you in any way to get you to enter a plea of guilty?"; she replied, "[n]o, your Honor." (Crim. Doc. 49 at 14).

Ms. Mollica fails to explain why she did not raise any issues of coercion at the plea colloquy or during sentencing. And she does not elaborate on the "first plea deal" or identify which charges she claims are "unrelated charges" supposedly added in retribution for not accepting a different deal. In addition, Ms. Mollica does not describe when the unnamed prosecutors attempted to meet her without her attorneys' knowledge.

The court finds Ms. Mollica's claim of coercion merely speculative; it does not entitle her to relief. *See Prada v. United States*, 692 F. App'x 572, 574 (11th Cir. 2017) ("The files and records of the case conclusively show that Prada was not entitled to relief because most of the issues he raised were conclusory and speculative in nature.") (citing 28 U.S.C. § 2255(b)). The court will DENY Claim 35 on these grounds.

### 5. The Court's "Threats" (Claim 36)

Ms. Mollica contends that the court "threatened [her] with additional charges if she chose to withdraw her plea." (Crim. Doc. 1 at 17, Claim 36). But the record shows no threats from the court. At sentencing, Ms. Mollica's counsel suggested that the government's choice to no longer "honor" its promise to recommend a reduction in Ms. Mollica's guideline range for acceptance of responsibility voided the plea agreement. (Crim. Doc. 89 at 7–8). The court explained that if Ms. Mollica chose to withdraw from the plea agreement, she would then face *all* of the 82 charges for which the grand jury had indicted her. (*Id.* at 9–10). The court did not "threaten" Ms. Mollica with new charges, but merely noted the reality that voiding the plea agreement would cut both ways: if Ms. Mollica were to pursue her theory that the plea agreement was void, *i.e.*, null and of no effect, or otherwise withdraw from the plea agreement, the government would no longer be obligated to dismiss the other 57 charges against her as it agreed to do in the plea agreement. (*Id.*).

The court merely explained the reality about Ms. Mollica's choices and never threatened her, so the court will DENY Claim 36.

### 6. The Court's Explanation of Sentencing Consequences (Claim 39)

Ms. Mollica directs Claim 39 at both the court and her counsel. The court

here addresses only Ms. Mollica's claim against the court and will address her allegation against her counsel when addressing her several ineffective assistance of counsel claims.

Ms. Mollica claims that the court failed to advise her that she faced supervised release as a potential consequence of her guilty plea. (Doc. 1 at 17, Claim 39). But the plea agreement expressly notes that Ms. Mollica faced supervised release as part of her sentence. (Crim. Doc. 25 at 2–6, 19). Likewise, at the plea colloquy, the court stated that the maximum penalty included up to five years of supervised release for some counts and up to three years of supervised release for other counts as a consequence of her guilty plea. (Crim. Doc. 49 at 16–20). And, at the plea colloquy, Ms. Mollica confirmed that she understood the penalties she faced by pleading guilty. (*Id.* at 20).

The court and the written plea agreement unambiguously informed Ms. Mollica that she faced supervised release by pleading guilty, so the court will DENY Claim 39 against the court.

### 7.    *Mental Health (Directed at the Court) (Claim 40)*

Continuing with her claims against the court, Ms. Mollica argues that, at the plea colloquy, the court failed to ask her questions about her mental health or the effect of her drug use on the plea negotiations. (Doc. 1 at 17, Claim 40). In her

reply brief, Ms. Mollica elaborates that she did not understand the plea agreement and that her medications and mental condition prevented her from doing so. (Doc. 11 at 8–10). Also in her reply brief, Ms. Mollica directs her mental health claim against her counsel, which the court will address with Ms. Mollica's several ineffective assistance of counsel claims.

The plea colloquy undercuts Ms. Mollica's mental health claim. After placing Ms. Mollica under oath, the court asked Ms. Mollica if she had "taken or received any drugs, intoxicants, narcotics, or medications of any kind including prescription drugs or over-the-counter medicines" within the prior 72 hours, and Ms. Mollica responded that she took Celexa for depression, Trazodone for anxiety, and Diovan for blood pressure. (Crim. Doc. 49 at 2–3). The court then asked Ms. Mollica specifically if any of those medications would "in any way affect [her] ability to understand and respond to [the court's] questions today," and Ms. Mollica responded that her medications would not do so. (*Id.* at 3).

The court then asked Ms. Mollica if she had "any mental impairment that may affect [her] ability to understand and respond to [the court's] questions," and Ms. Mollica responded that she did not. (Crim. Doc. 49 at 3). Although the court did not ask Ms. Mollica specifically about plea negotiations, Ms. Mollica's drug use or mental health during the plea negotiations did not affect her ability to

understand or reject the plea agreement at the plea colloquy, as the court confirmed both Ms. Mollica's satisfaction with the agreement and her desire to plead guilty. And, again, the court encouraged her to let the court know if she did not understand anything, but she never did. (*Id.*).

The court finds that Ms. Mollica's mental health or medication did not affect her ability to knowingly and voluntarily enter her guilty plea, so the court will DENY Claim 40 against the court.

### 8. *The Court's Explanation of the Consequences of Subsequent Conduct (Claim 41)*

Ms. Mollica claims that the court did not "specifically tell [her] that if she got in trouble again while on pre-trial release, that the plea agreement could be withdrawn." (Doc. 1 at 17, Claim 41). But, again, the plea agreement could not be more specific or clear on this point.

The plea agreement states: "The defendant understands that should the defendant *violate any condition of pretrial release or violate any federal, state, or local law*, . . . the United States will no longer be bound by its obligation to make the recommendation set forth in . . . the Agreement . . . ." (Crim. Doc. 25 at ¶ X) (emphasis added).

Ms. Mollica confirmed her understanding by initialing directly below this provision (Crim. Doc. 25 at 23), signing the plea agreement on the next necessary

signature line (*id.* at 28), and by signing the end of the agreement to indicate that she had read, understood, and approved "of all provisions of this Agreement, both individually and as a total binding agreement" (*id.* at 31). And, at the plea colloquy, Ms. Mollica confirmed that the plea agreement "set forth everything on which [she was] relying by way of a plea bargain or plea agreement with the government," that she had a "sufficient opportunity to fully discuss" the plea agreement with her counsel, and that she did not have any questions "regarding the meaning of the agreement, its operation, or what effect it may have." (Crim. Doc. 49 at 11).

The court finds that Ms. Mollica fully understood that the government would not be bound by the plea agreement if she "got in trouble again" after entering her guilty plea. The court will DENY Claim 41 on these grounds.

### D.    The Government's Alleged Breach of the Plea Agreement (Claim 3)

Having resolved all of Ms. Mollica's claims disputing the knowing and voluntary nature of her guilty plea, the court turns next to Ms. Mollica's challenge to the enforceability of the written plea agreement altogether. She asserts that the court should not enforce the plea agreement because the *government* breached the agreement by failing to adhere to its promise to recommend a 12-year total sentence and a guideline range reduction for acceptance of responsibility. (Doc. 1

at 13, Claim 3).

But the *government* did *not* breach the plea agreement—Ms. Mollica did. The government and Ms. Mollica agreed to condition the government's sentencing recommendations on Ms. Mollica's good behavior prior to sentencing. (Crim. Doc. 25 at ¶ X). Ms. Mollica failed to fulfill her promise by committing the offense of "use of a communication facility to distribute controlled substances" in violation of 21 U.S.C. § 843(b) shortly after entering the plea agreement. (PSR at ¶ 109). This criminal conduct released the government from its corresponding promise to make its sentencing recommendations.

However, after Ms. Mollica's breach, the other parts of the plea agreement remained intact, including the government's promise to dismiss 57 of the claims it had brought against Ms. Mollica in exchange for her guilty plea. And, in any event, the government recommended a sentence at the low end of Ms. Mollica's advisory guideline range calculated after her new crimes, just as it had agreed to recommend a sentence at the low end of her initial advisory guideline range. (*Compare* Crim. Doc. 25 at 19, *and* Crim. Doc. 89 at 79).

The government did not breach the plea agreement so the plea agreement remains enforceable. In any event, the court gave Ms. Mollica the opportunity to withdraw her plea agreement when she learned she would not receive the

35

acceptance of responsibility reduction and she declined the opportunity. The court will DENY Claim 3 on these grounds.

### E. Ineffective Assistance of Counsel (Claims 4–6, 10, 12, 22, 37–39, 40, 42)

Ms. Mollica aims her next set of claims at her retained counsel. Ms. Mollica attacks the validity of her guilty plea because she entered her plea and the plea agreement without effective assistance of counsel. She also alleges ineffective assistance of counsel in circumstances not related specifically to her guilty plea. In the plea agreement, Ms. Mollica expressly reserved her right to bring these claims for ineffective assistance of counsel in a § 2255 motion. (Crim. Doc. 25 at 21).

The Sixth Amendment gives criminal defendants the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that (1) her counsel's performance fell below an objective standard of reasonableness; and (2) she suffered prejudice because of that deficient performance. *Id.* at 687–88, 692. The test for ineffectiveness "is not whether counsel could have done more; perfection is not required. . . . Instead, the test is whether some reasonable attorney could have acted, in the circumstances, as [counsel] did—whether what they did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995)

36

(quoting *Strickland*, 466 U.S. at 689).

As to the first element of the ineffective assistance of counsel test, the court must presume that the movant's counsel acted reasonably. *Strickland*, 466 U.S. at 690. To overcome that presumption, a movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* And conclusory or unsupported allegations of counsel's errors cannot support an ineffectiveness of counsel claim. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (finding "unsupported allegations, conclusory in nature and lacking factual substantiation" to be an insufficient basis for relief).

As to the second element of the ineffective assistance of counsel test, prejudice arises only if "a reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

With the *Strickland* test in mind, the court turns now to the merits of Ms. Mollica's ineffective assistance of counsel claims: Claims 4–6, 10, 12, 22, 37–39, 40, and 42.

### 1. Counsel's Failure to Withdraw the Plea Agreement (Claim 4)

Ms. Mollica contends that her counsel failed to follow her instructions to

withdraw the plea agreement. (Doc. 1 at 13, Claim 4). As she alleges in Claim 3, Ms. Mollica asserts in Claim 4 that the government breached the plea agreement and so her counsel should have withdrawn the agreement, apparently as she told him to do. But, as the court discussed above for Claim 3, the government did not breach the plea agreement, so counsel had no reason to withdraw the plea agreement.

And the record shows no evidence that Ms. Mollica ever instructed her counsel to withdraw the agreement. At the beginning of the sentencing hearing, Ms. Mollica's counsel argued that the *entire* plea agreement was null and void because the government was no longer bound to the sentencing recommendations in the agreement. (Crim. Doc. 89 at 7–11). But he then conferred with Ms. Mollica to explain her options and then told the court, "[w]e have decided that I am incorrect in my assertion of this particular ground," and then withdrew his objection to the entire plea agreement. (*Id.* at 11). Had her counsel misrepresented to the court what they both decided, Ms. Mollica could have said so; she did not, even when the court asked her directly if she had anything to say before sentencing. (*Id.* at 44). Put simply, if Ms. Mollica truly wanted to withdraw the plea agreement, she could have, but never did.

Even if Ms. Mollica's claim could be read as arising from the loss of her

anticipated acceptance-of-responsibility reduction, her counsel acted reasonably in counseling her not to withdraw her guilty plea. Had Ms. Mollica withdrawn the plea agreement, she would have severely prejudiced herself by erasing the plea bargain's substantial benefit of the dismissal of 57 counts. She also would release the government from its agreement to recommend a sentence at the low end of the guideline range. (*See* Crim. Doc. 89 at 13, 51, 78–79).

No evidence exists that Ms. Mollica instructed her counsel to withdraw the plea agreement, counsel acted reasonably by not withdrawing the plea agreement for her, and she avoided substantial prejudice by not withdrawing the plea agreement. She has not demonstrated ineffective assistance of counsel in this regard and the court will DENY Claim 4.

### 2. Counsel's Failure to Explain Charges (Claim 5)

Ms. Mollica contends that her counsel "never explained the required concepts of 'aiding and abetting' to [her], and rather indicated that by merely 'being present' that [she] would be convicted of the charge at trial." (Doc. 1 at 13, Claim 5). According to Ms. Mollica, her counsel's advice was incorrect because "the U.S. Attorney's office would not have been able to prove the necessary elements of aiding and abetting, specifically that [she] had foreknowledge that a crime would be committed in the future." (*Id.*).

The record contradicts Ms. Mollica's allegation.  In an affidavit, one of Ms. Mollica's attorneys, James Parkman, stated that he thoroughly explained to Ms. Mollica the concept of "aiding and abetting."  (Doc. 9-17 at 1).  Ms. Mollica has not disputed this testimony.  And as the court addressed above for Ms. Mollica's Claim 2, the term "aiding and abetting" is not essential to the crimes to which she pled guilty, she confirmed at the plea colloquy that she fully understood the indictment and the terms of the plea agreement, and she noted at the plea colloquy that she had covered the indictment with counsel in "[a] lot of detail."  (Crim. Doc. 49 at 11–15, 20, 23, 25, 28–32).  So, even if counsel did not explain "aiding and abetting," the record shows that Ms. Mollica could not have been prejudiced by counsel's failing to do so.

The record undercuts Claim 5, and even if Ms. Mollica had a factual basis for the claim, it would fail for lack of showing prejudice.  The court will DENY Claim 5 on these grounds.

### 3.    Counsel's Failure to Inform About an "Open Plea" (Claim 6)

Ms. Mollica asserts that counsel was ineffective for failing to discuss with her the possibility of making an "open plea."  (Doc. 1 at 13, Claim 6).  Liberally construing Ms. Mollica's argument, the court assumes that the "open" plea to which she refers to what is usually called a "blind plea" in which she would have

pled guilty to *all* of the charges brought against her without any promise from the government to recommend a sentence at the low end of the guideline range.

But courts do not second-guess counsel's reasonable strategic decisions. *See Chandler*, 218 F.3d at 1314 (citing *Darden v. Wainwright*, 477 U.S. 168 (1986), which stated that counsel will not be found incompetent if his approach "might be considered sound trial strategy"). Here, Ms. Mollica's counsel noted in an affidavit that, in his view, an "open" or "blind plea" would have been "insane" given the government's offer to drop many of the charges if she agreed to a plea deal. (Doc. 9-17 at 3). Indeed, without the government's concessions, Ms. Mollica faced potential life imprisonment. And even after Ms. Mollica undermined her lawyers' efforts to secure her a good deal by her ill-fated obstruction of justice, Ms. Mollica reaped a significant benefit from the plea bargain with the dismissal of 57 counts and the recommendation of a sentence at the low end of the guideline range. The court thus sees no merit in Ms. Mollica's argument that counsel should have pursued a "blind" or "open" guilty plea.

The court will DENY Claim 6 as without merit.

### 4. Counsel's Effectiveness Regarding Sentencing (Claim 10)

Ms. Mollica spreads challenges to her counsel's effectiveness regarding her sentencing across her petition and reply pleading. In her petition, Ms. Mollica lobs

a general challenge, first stating that counsel "did not understand the points, enhancements, etc. of the sentencing guidelines." (Doc. 1 at 14, Claim 10). Her vague argument that counsel did not understand the Sentencing Guidelines fails because it is conclusory. *See Tejada*, 941 F.2d at 1559 ("A petitioner is *not* entitled to an evidentiary hearing, however, 'when his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.''") (quoting *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990)) (quoting in turn *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). In any event, the record shows that counsel made a lengthy and nuanced argument at sentencing about the appropriate guideline range and demonstrated a proficient understanding of the Sentencing Guidelines. (Crim Doc. 89 at 14–26, 28–44).

Ms. Mollica then argues in her petition that counsel "grossly overestimated the possible sentences [she] could have received should she have chosen to take her case to trial." (Doc. 1 at 14, Claim 10). She briefly elaborates on this claim in her reply pleading, stating that counsel "failed to properly and accurately apprise [her] of her likely sentence exposure, and only [told] her that she 'could get 30 years to life' if she did not sign the plea agreement." (Doc. 11 at 10).

But, at the plea colloquy, the court informed Ms. Mollica of the statutory maximum sentences for the counts to which she pled guilty: 30 years for the wire

fraud counts; 20 years for Count 76 of mail fraud; 30 years for the other mail fraud counts; 20 years for the money laundering counts in violation of 18 U.S.C. § 1956; 10 years for the money laundering counts in violation of 18 U.S.C. § 1957; two years consecutive for the aggravated identity theft count; and three years for the false tax return counts. (Doc. 49 at 16–19). The court asked Ms. Mollica if she understood those maximum statutory penalties and Ms. Mollica told the court that she did. (*Id.* at 20). The court also told her that the aggravated identity theft count carried a mandatory minimum consecutive sentence of two years, and she told the court that she understood. (*Id.*). And, again, Ms. Mollica told the court that she was satisfied with counsel. (*Id.* at 32). So, Ms. Mollica understood the potential penalties she faced and counsel's assessment that Ms. Mollica faced a range of 30 years' imprisonment to life if she went to trial was not inaccurate as to Ms. Mollica's sentencing exposure as charged.

Ms. Mollica adds several other challenges in her reply pleading. First, she asserts that counsel failed to push for a lower fraud loss amount by failing to explain that she had a right to a hearing about the "actual loss," offer evidence at her sentencing about the loss amount, and object to the double-counting of certain losses. (Doc. 11 at 10, 13–14). But counsel did not act unreasonably by failing to offer futile objections to the loss amount. As the court has noted, Ms. Mollica

43

*stipulated* to the loss amount of $11,000,000 in her plea agreement and Ms.

Mollica thus did not have any right to a further hearing on the loss amount.  (Crim.

Doc. 25 at 11).

And, in any event, counsel urged the court to consider what Ms. Mollica

now claims he did not.  At sentencing, counsel pressed the court to depart

downwardly from Ms. Mollica's guideline range because the Sentencing

Guidelines loss amount rules overstated Ms. Mollica's complicity in the $11

million total loss.  (Crim. Doc. 89 at 32–35).  The court agreed in part and, as

further explained below when addressing Ms. Mollica's several challenges to her

guideline sentence range, varied downwardly by seven years from the 24-year low-

end sentence advised by the guideline fraud loss enhancements.  (*Id.* at 82).  So

counsel effectively relied on Ms. Mollica's impression of her responsibility for the

loss in arguing for a substantially reduced sentence.

Next, Ms. Mollica contends that counsel should have presented character

witnesses at sentencing, but fails to identify who he should have called.  (Doc. 11

at 15).  But, although he did not present witnesses, Ms. Mollica's counsel zealously

defended Ms. Mollica's character at sentencing.  (Crim. Doc. 89 at 28–44).  And

even setting aside Ms. Mollica's failure to identify the witnesses that counsel

should have presented, Ms. Mollica cannot show prejudice because the court

varied significantly downward from her guideline range and took into account the facts—both the good and the bad—relevant to Ms. Mollica's character when fashioning its sentence. Additional testimony about Ms. Mollica's character would not have changed this court's sentence, so she showed no prejudice.

And, finally, Ms. Mollica argues that, at sentencing, counsel should have asked the court to place her in the Bureau of Prisons's residential drug and alcohol program ("RDAP"). (Doc. 11 at 13). Although counsel did not specifically request that the court recommend Ms. Mollica for the RDAP, that failure did not prejudice Ms. Mollica. Though the Bureau of Prisons places great weight on the court's recommendation, the court's recommendation would have been just that—a recommendation. The court cannot answer whether the Bureau would have accepted Ms. Mollica into the RDAP because the Bureau has wide discretion in determining eligibility for the RDAP. *See* 18 U.S.C. § 3621(e)(1)(C) ("[T]he Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment . . . for all eligible prisoners . . . ."); 28 C.F.R. § 550.53(b), (e) (delegating to the Bureau of Prisons the authority to determine whether a prisoner is eligible for RDAP). Further, Ms. Mollica presented no evidence to suggest that she cannot obtain placement in the RDAP despite the lack of any specific recommendation from the court. *See* 28 C.F.R. § 550.53(c)

("Inmates may apply for the RDAP by submitting requests to a staff member . . . ."). And the court recognized Ms. Mollica's severe past and current substance abuse issues and accordingly ordered her to participate in the probation office's drug and alcohol intensive counseling and after-care service program as one of her conditions of supervised release. (*See* Crim. Doc. 89 at 94).

The record demonstrates counsel's effectiveness at sentencing and Ms. Mollica suffered no prejudice from counsel's alleged defects. The court will DENY Claim 10 on these grounds.

### 5. Counsel's Failure to Withdraw the Plea Agreement Based on the Alleged Brady Violation (Claim 12)

Ms. Mollica's Claim 12 asserts that her counsel was ineffective for failing to "withdraw [the] plea agreement based on Ground 8 *Brady* violation." (Doc. 1 at 14, Claim 12). Claim 11, not Claim 8, alleges the *Brady* violation for the government's withholding of Sheila Parker's statement, so the court presumes that Ms. Mollica intended for Claim 12 to reference Claim 11, not Claim 8.

But as the court discussed above, the prosecutors did not commit a *Brady* violation by withholding Sheila Parker's statement, so Ms. Mollica's counsel acted reasonably by not withdrawing the plea agreement. And, again, counsel could not withdraw Ms. Mollica's plea agreement; only she could do so, and she never told the court that she wanted to.

The court will DENY Ms. Mollica's Claim 12 as without merit.

### 6.    Counsel's Failure to Investigate (Claim 22)

Ms. Mollica makes a generalized assertion that counsel failed to fully investigate her crimes and available defenses. (Doc. 1 at 15, Claim 22). But Ms. Mollica does not identify what any further investigation from her counsel would have revealed or what defenses she had. And she admitted to her guilt under oath. *See Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) (affirming district court's denial of claim that counsel rendered ineffective assistance by failing to challenge whether conspiracy offense involved more than one person because "[p]leading guilty necessarily admits the commission of the crime."). Ms. Mollica's claim also fails as conclusory and lacking factual substantiation. *See Tejada*, 941 F.2d at 1559.

The court will DENY Claim 22 as conclusory and meritless.

### 7.    *Failure to File Appeal and Explain Appellate Process (Claim 37)*

Ms. Mollica asserts that counsel was ineffective for failing to file an appeal. (Doc. 1 at 17, Claim 37). Ms. Mollica raised this claim in her original motion, framing it as an issue with her jailer preventing her from communicating with counsel. But, in her reply, Ms. Mollica reframes her claim as one that counsel should have filed an appeal on her behalf and that counsel failed to explain the

47

appellate process to her.  (Doc. 11 at 6–10).

The Supreme Court has "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable" under the first prong of the *Strickland* test.  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Peguero v. United States*, 526 U.S. 23, 28 (1999), and *Rodriquez v. United States*, 395 U.S. 327 (1969)).  But only if counsel consulted with his client, the client directed counsel to appeal, and counsel thereafter failed to file an appeal will counsel have failed to render constitutionally adequate performance.  *Flores-Otega*, 528 U.S. at 478.

Here, in an affidavit, one of Ms. Mollica's attorneys, William White, explained his efforts to facilitate an appeal.  (Doc. 9-17).  After sentencing, on August 15, 2016, Mr. White met with Ms. Mollica at the Cullman County Detention facility and told Ms. Mollica that, if she wished to do so, counsel would help her file the notice of appeal and then help her obtain new counsel for the appeal.  (*Id.* at 5).  Mr. White told Ms. Mollica that she would have to file her notice of appeal within 14 days of sentencing.  Counsel also explained to Ms. Mollica how she would be able to obtain court-appointed counsel for any appeal that she wanted to pursue.

Ms. Mollica told Mr. White that she wanted to speak with her husband, who

is also an attorney, and that her husband would contact counsel if she wanted to pursue an appeal.  (Doc. 9-17 at 5).  Mr. White emailed Ms. Mollica's husband— the email is attached to Mr. White's affidavit—and informed him that Ms. Mollica instructed counsel to wait until hearing from him about whether to file a notice of appeal.  (*Id.* at 6–7).  Counsel never heard from Ms. Mollica or her husband, so counsel never filed an appeal.

In her reply, Ms. Mollica does not dispute that she told counsel she wanted to consult with her husband about an appeal and that her husband would contact them if she wanted to pursue an appeal.  (*See* Doc. 11 at 6–8).  And she did not file an affidavit presenting her version of the discussion with Mr. White.  Instead, Ms. Mollica generally "denies the content" of Mr. White's affidavit "as it pertains to the appeals procedure," and she states that the affidavit inaccurately depicts the events of her meeting with Mr. White.  (*Id.* at 7).

But Ms. Mollica *does not* allege that she ever directed her counsel to file an appeal, provide any specific refutations of Mr. White's attestations, or deny that he met with her at the jail to discuss the possibility of filing an appeal—in fact, she admits in her petition that "her attorney met with her regarding an appeal."  (Doc. 1 at 17).  Similarly, she does not contradict Mr. White's statement that she told counsel to wait for further instructions from her husband.  (*See* Doc. 11 at 6–10).

The court finds that Ms. Mollica did not direct her counsel to file an appeal, nor did her husband on her behalf, so counsel did not have a constitutional duty to file an appeal. The court will DENY Claim 37 as without merit.

### 8.    *Counsel's Conversation with Postal Inspectors (Claim 38)*

Ms. Mollica argues that, after she pled guilty in this case, counsel provided constitutionally ineffective assistance on May 12, 2015 when they spoke to prosecutors and postal inspectors investigating the obstruction of justice offense for which Ms. Mollica ultimately pled guilty before Judge Hopkins. (Doc. 1 at 17, Claim 38). She asserts vaguely that the conversation was "inappropriate" and "adversely affected [her] case." (*Id.*).

But, as counsel detailed in their affidavit, they spoke to the prosecutors and postal inspectors only to determine why Ms. Mollica was arrested *after* she pled guilty. Ms. Mollica's arrest for the suspicious mailings blindsided counsel because she told them that she was *not* involved in the mailings. (Doc. 9-17 at 4). So, counsel went to the U.S. Marshall's Office where Ms. Mollica was being held, "believ[ing] there must be a mistake and that [she] would not have done anything to jeopardize her plea deal." (*Id.*). Counsel spoke to law enforcement officers "in an attempt to obtain information on their case in the hopes of finding exactly what had occurred involving Defendant Mollica and to preserve her plea agreement . . .

50

." (*Id.* at 4–5).  Then an officer asked Mr. Parkman if he would be representing

Ms. Mollica in her new case, and Mr. Parkman responded that he did not know.

Counsel asserts that "[n]othing inappropriate occurred by Attorneys Parkman and

White or by law enforcement" and that Mr. Parkman visited the U.S. Marshall's

Office only to investigate why his client was arrested.  (Doc. 9-17 at 4–5).

Ms. Mollica does not contradict counsel's version of their interaction with

law enforcement; she simply calls it "inappropriate," "adverse[]" to her case, and

"documented," though she does not state how or where.  (Doc. 1 at 17).  These

conclusory allegations do not entitle her to any relief.  *See Tejada*, 941 F.2d at

1559.

The record shows no inappropriate interaction between Ms. Mollica's

counsel and law enforcement, and counsel did not render ineffective assistance by

trying to determine why their client was arrested.  The court will DENY Claim 38

on these grounds.

### 9.  *Counsel's Explanation of Sentencing Consequences (Claim 39)*

The court previously addressed Ms. Mollica's Claim 39 against the court

and now turns to her claim against her counsel in Claim 39.

Ms. Mollica claims that counsel failed to advise her that supervised release

was a potential consequence of her guilty plea.  (Doc. 1 at 17, Claim 39).  But, as

the court previously discussed in the context of the same claim levied against the court, the plea agreement expressly notes that Ms. Mollica faced a supervised-release term as part of her sentence.  (Crim. Doc. 25 at 2–6, 19).  And, at the plea colloquy, Ms. Mollica confirmed that she understood the penalties she faced by pleading guilty, including a supervised-release term of not more than five years for the wire fraud counts; three years for Count 76 of mail fraud; five years for the other mail fraud counts; three years for the money laundering counts; one year for the aggravated identity theft count; and one year for the false tax return counts. (Crim. Doc. 49 at 16–20).  She also confirmed that she had a sufficient opportunity to discuss the plea agreement and the sentencing guidelines with her counsel, had no questions, and that she was satisfied with her counsel's representation.  (*Id.* at 10, 21, 32).

The court will DENY Claim 39 against her counsel for lack of any factual basis.

### 10.    *Mental Health (Directed at Counsel) (Claim 40)*

For the first time in her reply pleading, Ms. Mollica directs her mental health claims in Claim 40, which she originally brought against the court, against her counsel.  (Doc. 11 at 9–11).

Ms. Mollica contends that her counsel "never raised" the issue of her mental

health, never questioned her about her addictions and mental health, never told her

"it was important to be truthful" about her mental health and addictions, and

"failed to properly explore the issue of [Ms. Mollica's] mental health." (*Id.* at 9,

11).

Again, the record reflects a different reality. As the court discussed above,

at the plea colloquy, Ms. Mollica confirmed under oath that she had no mental

impairment affecting her ability to plead guilty. (Crim. Doc. 49 at 3). And the

PSR explained Ms. Mollica's mental and emotional health issues in detail. (PSR at

¶¶ 121–25). Further, at sentencing, Ms. Mollica's counsel emphasized her mental

health issues in urging the court to vary downwardly from the guideline range:

> [I]n looking at Terri Mollica and what we've seen and what I have found out about, [] she did not have a very good upbringing. She had a very horrible home life. It reads that her father was very abusive to her and her sister during this time period. Even to the fact that it wasn't only just a mental abuse, it was physical abuse.
>
> Terri, her mother, had problems during this time period. Terri took it on herself to take care of her mother and her sister.
>
> Terri has been receiving, before even this got involved, some psychiatric help with regards to depression and her lifestyle and what was happening with her family and where -- and what had happened to her in the past.
>
> I do think that the Court ought to take into consideration upbringing in this case. I do think that in some respects her actions are a reflection of two things, maybe what occurred during her youthful age as far as living in an abusive family, and also with

regards to the fact that it's obvious that she went to a psychiatrist, and that's undisputed, well before this happened, and was still seeing a psychiatrist during the time that it happened. I think that indicates that somewhere along the lines something happened to her. Whether it's from upbringing or whatever, I don't know.

. . .

With regards to what happened with her and her mental stability, I don't know, other than the fact that this is way out of character for someone that you would see that has gone through life and done things on her own and come up from a hard background to make something of herself.

(Crim. Doc. 89 at 36–37). So, contrary to Ms. Mollica's assertions, counsel did, in fact, raise and explore the issue of Ms. Mollica's mental health with the court at sentencing.

Next, Ms. Mollica claims that her counsel was "ineffective during the plea negotiations when it counted most, when [her] mental state threatened to sabotage the original plea agreement, which called for her to serve ten years on the underlying charges, and two additional years on the aggravated identity theft." (Doc. 11 at 10). And she vaguely adds that counsel "failed to fulfill the obligations of an aggressive counsel during the entire plea negotiation process," suggesting that effective counsel would have better used her cooperation to obtain better sentencing concessions. (*Id.* at 11). According to Ms. Mollica, her counsel "squandered the potential advantages of" her cooperation. (*Id.*).

But Ms. Mollica—not counsel—"squandered" the advantages of her cooperation. Ms. Mollica's choice to reengage in criminal activity doomed her chances of keeping intact the sentencing concessions originally provided in the plea bargain. No matter how much counsel emphasized Ms. Mollica's mental health issues to the court, counsel was helpless to prevent the damage Ms. Mollica caused to herself. But even overlooking those facts, Ms. Mollica, once again, forgets her own words: under oath, Ms. Mollica stated that she was not suffering from any mental impairment, she was satisfied with counsel throughout the plea negotiation process, and she would advise the court if she did not understand anything; she failed to do so. (Crim. Doc. 49 at 3–4, 32).

The court will DENY Ms. Mollica's Claim 40 as without merit.

### 11. *Counsel's Failure to Request a Change of Venue (Claim 42)*

Finally, Ms. Mollica argues that counsel should have moved for a change of venue based on "the U.S. Attorney's predilection for giving interview[s] with the local media." (Doc. 1 at 18, Claim 42). Ms. Mollica does not elaborate on the U.S. Attorney's "predilection" to give interviews and only vaguely alleges in her reply pleading that her case had "pretrial publicity." (Doc. 11 at 15).

Though Ms. Mollica does not cite any news release or interview, the press did report about Ms. Mollica and Jonathan Dunning's health care fraud. But the

press coverage did not rise to the level of publicity "so inflammatory and pervasive as to raise a presumption of prejudice" to justify a change in venue. *United States v. Campa*, 459 F.3d 1121, 1144 (11th Cir. 2006); *see Chandler v. Crosby*, 454 F. Supp. 2d 1137, 1160 (M.D. Fla. 2016), *aff'd sub nom. Chandler v. McDonough*, 471 F.3d 1360 (11th Cir. 2006) (three nationally syndicated television shows unfavorable to the defendant did not raise a presumption of prejudice).

And a change in venue because of publicity would only change the location of the trial and the composition of the jury; neither affected the validity of her guilty plea or her sentence. *See* Fed. R. Crim. P. 21(a); *Campa*, 459 F.3d at 1143 (finding that a change of venue because of publicity is required only if "there is a reasonable certainty that such prejudice will prevent him from obtaining a fair trial by an impartial jury."). So a motion for change of venue based on publicity would have been denied, and Ms. Mollica's counsel did not act unreasonably by not bringing such a motion. Because a change in venue would have had no effect on her plea and sentence as the same judge would conduct those hearings regardless of the venue for trial purposes, Ms. Mollica can show no prejudice.

Ms. Mollica also alleges that her counsel should have requested a change of venue because of a judicial conflict of interest—not with the undersigned judge who presided over her case, but with another judge in the Northern District of

Alabama. (Doc. 1 at 18, Claim 42). She alleges that Judge Abdul Kallon "had been a counsel with Bradley Arant, who represented Birmingham Health Care, Inc., (BHC) one of the affected companies in this matter." (Doc. 11 at 15). But the undersigned's impartiality could not be reasonably questioned because of Judge Kallon's prior employment. *See* 28 U.S.C. § 455(a) (requiring a judge to "disqualify himself in any proceeding in which *his* impartiality might reasonably be questioned.") (emphasis added). And a fellow U.S. District Judge's prior employment with the law firm representing a victim of the defendant's crimes provides no statutory grounds for disqualification. *See* 28 U.S.C. § 455(b) (enumerating circumstances in which a judge must disqualify herself). So Ms. Mollica's counsel acted reasonably by not requesting a change of venue based on a supposed judicial conflict of interest argument.

The court will DENY Ms. Mollica's Claim 42 as frivolous.

## F. Substantive Claims Challenging Conviction and Sentence (Claims 1, 8, 13–21, 23–34, 43)

Having found that Ms. Mollica entered her oral guilty plea and the signed written plea agreement knowingly, voluntarily, and with the effective assistance of counsel, the court finally turns to Ms. Mollica's numerous claims attacking her conviction and sentence.

As further discussed below, the collateral-attack waiver in Ms. Mollica's

written plea agreement bars most of these claims.  (*See* Crim. Doc. 25 at 20).  And the court will uphold the appeal waiver because, for the following reasons, Ms. Mollica waived her appeal rights knowingly, voluntarily, and with effective assistance of counsel.  *See Williams v. United States*, 396 F.3d 1340, 1341 (11th Cir. 2005) ("It is well-settled that sentence-appeal waivers are valid if made knowingly and voluntarily.").

First, Ms. Mollica entered the collateral-attack waiver knowingly, voluntarily, and with effective assistance of counsel because, for the multitude of reasons discussed above when addressing Ms. Mollica's several other claims, Ms. Mollica entered her entire written plea agreement knowingly, voluntarily, and with effective assistance of counsel.  The written agreement, of course, contains the collateral-attack waiver.

In addition, Ms. Mollica signed directly below the collateral-attack waiver in the written plea agreement.  (Crim. Doc. 25 at 22).  By doing so, she signified that she "fully underst[ood]" that she gave up her rights to challenge her conviction and sentence, reserved the right to challenge any sentence imposed in excess of the statutory maximum sentence or the guideline sentencing range, reserved the right to bring claims for ineffective assistance of counsel, discussed the Sentencing Guidelines and their application to her case with counsel "who explained them to

[her] satisfaction," and "knowingly and voluntarily" entered into the waiver. (*Id.* at 20–22).

Further, at the plea colloquy, the court engaged Ms. Mollica specifically about the collateral-attack waiver. (Crim. Doc. 49 at 11–13); s*ee United States v. Bushert*, 997 F.2d 1343, 1352 (11th Cir. 1993) ("[I]n most circumstances, for a sentence appeal waiver to be knowing and voluntary, the district court must have engaged the defendant about the sentence appeal waiver during the Rule 11 hearing.").

At the plea colloquy, the court and Ms. Mollica had the following exchange demonstrating that she understood precisely what rights she was relinquishing and did so voluntarily and with counsel's effective assistance:

> THE COURT: Ms. Mollica, the plea agreement that you have entered contains language waiving or giving up some or all of your rights to appeal the sentence or to challenge the conviction collaterally. Do you understand what I mean by those terms?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Did you discuss those terms with your attorneys?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Okay. Do you understand that under certain conditions you can waive or give up those rights to appeal or to challenge the conviction collaterally, and such waiver would be enforceable against you to prevent a challenge to the conviction or sentence? Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: However, if you believe that such a waiver is not enforceable against you for some reason, you can appeal or challenge the conviction and present the theory about the waiver to the appellate court. At the time that you signed this agreement, however, did you understand that you were giving up some or all of those rights?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you make the decision to give up those rights after discussing the situation with your counsel?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you reach your own independent decision that giving up those rights was in your best interests under the circumstances of this case?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you have any questions about the waiver or its effect on you?

THE DEFENDANT: No, your Honor.

(Crim. Doc. 49 at 11–13).

The Eleventh Circuit has upheld several collateral-attack waivers when district courts similarly examined defendants' understanding of their waivers. *See, e.g.*, *United States v. DiFalco*, 837 F.3d 1207, 1212, 1220 (11th Cir. 2016) (upholding an appeal waiver when the district court told the defendant what the waiver meant, what exceptions applied, and that he would ordinarily have the right

to appeal his sentence); *United States v. Johnson*, 541 F.3d 1064, 1066, 1068 (11th Cir. 2008) (upholding an appeal waiver when the district court asked the defendant, "do you understand you would not have any right to appeal . . . [o]r to file a later lawsuit challenging your sentence on any other grounds?"); *Williams v. United States*, 396 F.3d 1340, 1341 (11th Cir. 2005) (upholding an appeal waiver because, "[a]t the plea colloquy, the district court specifically reviewed the [appeal waiver] in the written plea agreement with [the defendant], apprising him that he was waiving his right to challenge his sentence 'directly or collaterally,' and [the defendant] indicated his understanding of the provision" and "informed the court that he was entering the plea agreement knowingly and voluntarily."); *United States v. Benitez-Zapata*, 131 F.3d 1444, 1446, n.2 (11th Cir. 1997) (upholding an appeal waiver because the district court asked the defendant about his understanding of the plea agreement, the defenses and appeal rights that he was giving up, and whether he discussed the waiver with counsel).

For these reasons, the court finds that Ms. Mollica entered into her collateral-attack waiver knowingly, voluntarily, and with effective assistance of counsel. Therefore, she gave up her right to bring most substantive challenges to her conviction and sentence. *See Bushert*, 997 F.2d at 1350. Specifically relevant to her § 2255 petition, among other claims, she waived her rights to challenge an

alleged double jeopardy violation caused by pleading guilty to separate offenses, *Dermota v. United States*, 895 F.2d 1324, 1326 (11th Cir. 1990); the court's justification for the sentence imposed, *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011); the application of Sentencing Guidelines enhancements to her sentence, *United States v. Frye*, 402 F.3d 1123, 1129 (11th Cir. 2005); the court's treatment of objections to the PSR, *United States v. Martin*, 549 F. App'x 888, 889 (11th Cir. 2013); the court's balancing of the 18 U.S.C. § 3553(a) factors, *Allen v. United States*, 2016 WL 5376289, at *4 (S.D. Ga. Sept. 23, 2016); and supposed errors in the indictment, *Moss v. United States*, 2012 WL 1850867, at *5 (S.D. Ga. Mar. 27, 2012).

Thus, the collateral-attack waiver bars Claims 1, 8, 13–21, 23–33, and 43, and the claims are otherwise meritless. Ms. Mollica reserved her right to bring Claim 34, but the claim is frivolous. But, in an effort to thoroughly discuss all of Ms. Mollica's claims, the court will address—but ultimately deny—each of those claims independently.

### 1. *Multiplicitous Indictment (Claim 1)*

Ms. Mollica contends that the indictment "contains improper charging of the same offense in more than one count," which, according to Ms. Mollica, violates double jeopardy and Federal Rule of Criminal Procedure 7. (Doc. 1 at 13, Claim

1).  As discussed above, the collateral-attack waiver bars Claim 1 as a challenge to her conviction.  S*ee Dermota*, 895 F.2d at 1326 (11th Cir. 1990) (collateral-attack waiver bars double jeopardy claim on a § 2255 petition when defendant pled guilty to separate offenses); *Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Alternatively, Claim 1 fails on the merits.  Ms. Mollica does not identify which offense the indictment charged her twice.  The court assumes that she challenges how the indictment groups counts together and gives the same label to different groups, perhaps giving the impression that the government charged her for the same offense multiple times in a multiplicitous indictment.  *See United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) ("An indictment is multiplicitous if it charges a single offense in more than one count" and "violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant for the same offense.").

Indeed, the indictment separates the counts for mail fraud into two groups, counts 22–55 and counts 75 and 76; the counts for money laundering into two groups, counts 56–68 and counts 69–74; and the counts for filing false tax returns into five groups,  count 78, count 79, count 80, count 81, and count 82.  But the indictment does *not* charge her twice for the same offense.

Rather, each count is a separate offense occurring at separate times and involving separate transactions. The indictment appropriately charges each of Ms. Mollica's 21 wire transfers as a separate wire fraud count, each of her 36 mailings as a separate mail fraud count, each of her 19 check deposits and electronic transfers as a separate money laundering count, and each of her five false tax returns as a separate filing a false tax return count. *See United States v. Majors*, 196 F.3d 1206, 1212 n.14 (11th Cir. 1999) ("Money laundering is not a continuing offense. The statutory language and legislative history indicate that each transaction or transfer of money constitutes a separate offense.") (citations omitted); *Williams*, 527 F.3d at 1241 ("Where one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count."); *United States v. Edmondson*, 818 F.2d 768, 769 (11th Cir. 1987) ("Each mailing in furtherance of a fraudulent scheme constitutes a separate violation of the mail fraud statute."); *United States v. Morris*, 20 F.3d 1111, 1113 (11th Cir. 1994) ("[Defendants] were indicted by a federal grand jury for . . . four counts each (one per tax year) of filing and subscribing false personal income tax returns for 1985, 1986, 1987, and 1988.").

The indictment is not multiplicitous and the collateral-attack waiver bars Claim 1. The court will DENY Claim 1 on these alternative grounds.

## 2. The Court's Consideration of Ms. Mollica's Cooperation at Sentencing (Claim 8)

Ms. Mollica contends that the court abused its discretion in sentencing her without entertaining the full facts of her cooperation with the government. (Doc. 1 at 13, Claim 8). As discussed above, the collateral-attack waiver bars Claim 8 as a challenge to her sentence. *See Barrington*, 648 F.3d at 1197 (collateral-attack waiver bars challenges to the court's justification of the sentence).

Alternatively, Claim 8 fails on the merits. The court did entertain the full facts of Ms. Mollica's cooperation with the government, but noted that she squandered the benefit of that cooperation by committing obstruction of justice after pleading guilty. (Crim. Doc. 89 at 90). And cooperation—as opposed to the acceptance of responsibility, which is a separate ground for reduction—would support a downward departure requested by the government in a motion brought under U.S.S.G. § 5K1.1. The government, in its discretion and unsurprisingly, did not file a 5K motion.

In any event, a defendant who continues in criminal conduct loses the benefit she otherwise would earn from cooperation or accepting responsibility by violating the lawful subsequent conduct condition of the plea agreement. (*See* Crim. Doc. 25 at 23); *see also United States v. Cepero*, 338 F. App'x 834, 835 (11th Cir. 2009) (finding that the district court did not err in denying the defendant

an acceptance of responsibility reduction and enhancing his offense level for obstruction of justice when the defendant solicited false testimony and intimidated an inmate to not cooperate with the government).

The court will DENY Claim 8 as waived and meritless.

### 3. Error in the Indictment - Wire Fraud (Claim 13) and Mail Fraud (Claim 14)

Ms. Mollica contends that the counts for wire fraud and mail fraud failed to identify how any of her actions affected a financial institution. She also alleges that the wire fraud and mail fraud counts did not identify a principal or establish Ms. Mollica's willful participation to support "a conviction for aiding and abetting." (Doc. 1 at 14, Claims 13 and 14). The collateral-attack waiver bars Claims 13 and 14 as challenges to her conviction. S*ee Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *United States v. Ramirez*, 324 F.3d 1225, 1227 (11th Cir. 2003). Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by

66

failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claims 13 and 14 fail on the merits. The indictment lists each transaction that Ms. Mollica conducted that affected a financial institution by diverting money to enrich her through checks drawn on financial institutions insured by the Federal Deposit Insurance Corporation. (Crim. Doc. 1 at 9–10, 12–16); (*compare with* Crim. Doc. 1 at 21–25) (the second block of mail fraud counts, Counts 75 and 76, affected an insurance company, not a financial institution). And the government does not need to allege aiding and abetting or identify a principal in an indictment to ultimately convict the defendant of aiding and abetting. *United States v. Seabrooks*, 839 F.3d 1326, 1333 (11th Cir. 2016).

The court will DENY Claims 13 and 14 for these alternative grounds.

### 4.    *Error in Indictment - Using a Fictitious Name or Address (Claim 15)*

Ms. Mollica contends that the indictment charged her under 18 U.S.C. § 1342, Fictitious Name or Address, but does not offer any evidence that she used a fictitious name or address. (Doc. 1 at 14, Claim 15). The collateral-attack waiver bars Claim 15 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that

'[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

In any event, Claim 15 fails on the merits because the indictment did not charge her with violating 18 U.S.C. § 1342. The indictment lists each instance of mail fraud "in violation of Title 18, United States Code, Sections 1341 and 2"; that is, a violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 2 (aiding and abetting), *not* 18 U.S.C. § 1342. (Crim. Doc. 1 at 16, 25).

Ms. Mollica misinterprets the indictment. The court will DENY Claim 15 as waived and without merit.

### 5. *Error in Indictment - Insufficient Factual Basis for Money Laundering Charges (Claims 16 and 17)*

Ms. Mollica contends that the indictment does not provide a sufficient basis for the money laundering charges because the indictment does not show evidence of a specified unlawful activity; evidence that she tried to conceal or disguise the nature, location, source, ownership, or control of any proceeds; or evidence of any unlawful transaction. (Doc. 1 at 15, Claims 16 and 17). The collateral-attack

waiver bars Claims 16 and 17 as challenges to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claims 16 and 17 fail on the merits because an indictment must only provide a sufficient factual basis for the *charge*, not for a subsequent guilty plea or conviction. *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."); *Hamling v. United States*, 418 U.S. 87, 117 (1974) ("Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). And

the Eleventh Circuit has held that an indictment is sufficient if "it informs the defendant of the nature and cause of the accusation" and "if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge." *United States v. Fern*, 155 F.3d 1318, 1325 (11th Cir. 1998).

Here, the court finds no deficiency in the indictment's money laundering charges. The indictment identifies the unlawful activity that produced the money that Ms. Mollica laundered: mail fraud and wire fraud. (Crim. Doc. 1 at 17, 20). It specifies how she tried to disguise the nature and control of proceeds: she diverted federal grant funds, assets, and property of BHC and CACH to financial accounts that she controlled to enrich herself. (*Id.* at 5). And it lists each specific unlawful transaction. (*Id.* at 17–18, 20).

So, the indictment contains "a plain, concise, and definite written statement of the essential facts constituting [each] offense charged," and thus establishes a sufficient basis for the money laundering charges. *See* Fed. R. Crim. P. 7(c)(1); *United States v. Seher*, 562 F.3d 1344, 1357 (11th Cir. 2009) (indictment that stated the defendants "knowingly and intentionally conduct[ed] a financial transaction, namely, sold [jewelry] for [amount] . . . involving property represented to be the proceeds of specified unlawful activity . . . in violation of [18 U.S.C. §

1956 (a)(3)(B)–(C)]" supported a charge for money laundering).

The court will DENY Claims 16 and 17 on these alternative grounds.

### 6.      *Error in Indictment - Insufficient Factual Basis for Aiding and Abetting Mail Fraud Charges (Claim 18)*

Ms. Mollica challenges the indictment's factual basis for mail fraud regarding the life insurance policies on two grounds: (1) the indictment does not identify the principal "charged and convicted" of mail fraud; and (2) she did not commit a criminal act by sending demand for payment letters to Global Life because she only sought to "establish a deadline for filing a lawsuit." (Doc. 1 at 15, Claim 18). The collateral-attack waiver bars Claim 18 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claim 18 fails on the merits. As the court mentioned above

71

when addressing Claims 13 and 14, the indictment did not need to identify a principal to support an aiding and abetting charge. *See Seabrooks*, 839 F.3d at 1333. And the indictment sufficiently contains "a plain, concise, and definite written statement of the essential facts constituting" the mail fraud aiding and abetting charges by specifically stating which checks and letters Ms. Mollica mailed and how each mailing executed her health care fraud scheme. (*See* Crim. Doc. 1 at 11–16, 21–25); Fed. R. Crim. P. 7(c)(1); *United States v. Sharpe*, 438 F.3d 1257, 1259 (11th Cir. 2006) (indictment that stated the defendants knowingly devised a scheme to defraud and sent a package containing a check to a named recipient supported a charge for mail fraud).

Also, the indictment charged Ms. Mollica with mail fraud for sending the demand letters because she demanded payment on *fraudulently procured life insurance policies*—the fact that the demand letter sought to establish a deadline for filing a lawsuit is irrelevant.

The court will DENY Claim 18 as waived and without merit.

### 7. *Error in Indictment - Aggravated Identity Theft (Claim 19)*

Count 77 of the indictment charged Ms. Mollica with aggravated identity theft "during and in relation to the mail fraud charged in Counts 75 and 76." (Crim. Doc. 1 at 25). Ms. Mollica argues that the indictment did not have a

72

sufficient factual basis for mail fraud in Counts 75 and 76, so the indictment could not charge her with aggravated identity theft in Count 77. (Doc. 1 at 15, Claim 19). The collateral-attack waiver bars Claim 19 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claim 19 fails on the merits. As the court mentioned above when addressing Claim 18, the indictment provided a sufficient factual basis for mail fraud, so the indictment could predicate the aggravated identity theft charge on the mail fraud charge. *See* 18 U.S.C. § 1028A(a)(1), (c)(5) (permitting a charge of aggravated identity theft "during and in relation to" mail fraud).

The court will DENY Claim 19 on these alternative grounds.

### 8. *Error in Indictment - Insufficient Factual Basis for Filing False Tax Returns (Claim 20)*

Ms. Mollica contends that the indictment improperly predicated the counts for filing false tax returns counts on deposits held in escrow awaiting the sale of property. (Doc. 1 at 15, Claim 20). The collateral-attack waiver bars Claim 20 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claim 20 fails on the merits. The indictment states what Ms. Mollica reported as taxable income and what she should have reported as taxable income, thus presenting "a plain, concise, and definite written statement of the essential facts" of filing false tax returns. Fed. R. Crim. P. 7(c)(1). Ms. Mollica may dispute the IRS's calculation of her taxable income, but that does not diminish the sufficient factual basis for the filing false tax returns counts.

The court will DENY Claim 20 on these alternative grounds.

### 9.    *Error in Indictment - Improper Joinder of Mail Fraud and Aggravated Identity Theft Counts (Claim 21)*

Ms. Mollica contends that the indictment improperly joined the life insurance mail fraud counts and the aggravated identity theft count because these charges "are totally unrelated to [the] other charges and should have been separated." (Doc. 1 at 15, Claim 21). The collateral-attack waiver bars Claim 21 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claim 21 fails on the merits. Rule 8(a) of the Federal Rules of Criminal Procedure provides that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character. . . ." Here, the life insurance mail fraud counts and the

75

identity theft count are of the same or similar character to the other charges. Like Counts 22–55 for mail fraud, Ms. Mollica used mailings to defraud others and obtain money under false pretenses; she mailed fraudulent demand for payment letters on life insurance policies in an attempt to obtain $381,100. And the indictment predicates the aggravated identify theft count on the life insurance mail fraud counts; Ms. Mollica forged "Dr. K.T.'s" signature on the fraudulent death certificate she sent to the life insurance company. (*See* Crim. Doc. 1 at 25). So, the life insurance mail fraud and identify theft counts are of the same or similar character as the other counts and were properly joined in a single indictment.

The court will DENY Claim 21 on these alternative grounds.

### 10.    *Erroneous Fraud Loss Calculation (Claim 23)*

Ms. Mollica contends that the government erroneously double-counted approximately $250,000 of fraud loss by bringing multiplicitous charges. (Doc. 1 at 15, Claim 23). For Ms. Mollica's benefit, and consistent with her Claims 24 and 26, as well as her similar objection in her criminal case, the court construes Claim 23 liberally and assumes that Ms. Mollica also alleges that the government calculated—and the court adopted—the entire $11 million loss amount in error. The collateral-attack waiver bars Claim 23 as a challenge to her sentence. *See Demello v. United States*, 623 F. App'x 969, 973 (11th Cir. 2015) (finding that a

claim of ineffective assistance of counsel for failure to object to the loss amount calculation was really a collateral attack on the loss amount and sentence, and thus was barred by the collateral-attack waiver).

But, to the extent that the collateral-attack waiver does not bar Claim 23, the claim fails on the merits. The Eleventh Circuit reviews the district court's determination of loss amount for clear error and does *not* require "a precise determination of loss." *Barrington*, 648 F.3d at 1197. Instead, "[a] sentencing court need only make a reasonable estimate of the loss, given the available information." *Id.* (quotation omitted). Still, the court must calculate the estimated loss according to the Guidelines and support its calculation with reliable and specific evidence. *Id.*

Under the Guidelines, when the court sentences a defendant for a fraud crime, it must increase the defendant's offense level according to the amount of monetary loss the fraud caused if it caused a loss greater than $6,500. U.S.S.G. § 2B1.1(b). The Application Notes provide that the court should measure loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3 (emphasis added). "Actual loss" means "reasonably foreseeable pecuniary harm that resulted from the offense," and, in turn, "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the

circumstances, reasonably should have known, was a potential result of the offense." *Id.* Notably, the Guidelines do not contemplate loss as what the defendant *gained*, but rather what *resulted* from the offense. *See id.*

Here, the PSR calculated—and the court adopted—a loss amount of "at least $11,000,000," which carried a 20-level increase under the Guidelines. (PSR at ¶ 77). The court finds no error in this calculation. Ms. Mollica *stipulated* in her plea agreement that the fraud scheme in which she was involved caused that loss amount. (Crim. Doc. 25 at 11). She initialed the page of the "Factual Basis for Plea" section of the plea agreement that stated the $11 million loss amount, signed at the end of the "Factual Basis for Plea" section to "stipulate[] that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence," and agreed orally at the plea hearing that the plea agreement stated the factual basis for her plea and that the court could use those facts in fashioning a sentence. (Crim. Doc. 25 at 11, 16; Crim. Doc. 49 at 34–35). And her counsel *conceded* at the sentencing hearing that the entire scheme caused a loss in excess of $11 million. (Crim. Doc. 89 at 32–35).

In addition, as the court found as to Claim 1, the indictment did not bring multiplicitous charges, so her allegation of double-counting loss amounts based on a multiplicitous indictment fails. And she leaves the court to speculate as to the

origin or existence of the "approximately $250,000" that the government

supposedly double-counted.  (*See* Crim. Doc. 1 at 15, Claim 23).  Even if the court

overestimated the loss amount by $250,000, the loss amount would still exceed

$9.5 million and thus call for the same 20-level increase.  *See* U.S.S.G.

§ 2B1.1(b)(1)(K).

> The court will DENY Claim 23 on these alternative grounds.

### 11. The Court's Failure to Address Ms. Mollica's Objection to the Fraud Loss Calculation (Claims 24 and 26)

Ms. Mollica contends that the court failed to explain its factual findings on

her objection to the $11 million fraud loss calculation in violation of Federal Rule

of Criminal Procedure 32.  (Doc. 1 at 15–16, Claims 24 and 26).  The collateral-

attack waiver bars Claims 24 and 26 as challenges to her sentence.  *See Martin*,

549 F. App'x at 889 (collateral-attack waiver bars challenges to the court's

treatment of objections to the PSR in a § 2255 petition).

Alternatively, Claims 24 and 26 fail on the merits because the court

addressed Ms. Mollica's objection to the loss amount in detail at the sentencing

hearing.  In her objections to the PSR, Ms. Mollica argued that her loss amount

was an unspecified amount less than $1,000,000 and she should have received a

12-level enhancement for loss amount as opposed to a 20-level enhancement.

(Crim. Doc. 34 at 8–13).  She sought to distance herself from several millions of

dollars the health care fraud caused, asserting that she resigned from Synergy on November 29, 2010, and thereafter played no role in anyone else's illegal activity, absolving herself of responsibility for losses greater than some unknown amount less than $1,000,000. (*Id.* at 9). She pointed specifically to $350,000 that she asserted should not be attributed to her because Jonathan Dunning sent her that amount only to hold on his behalf. (*Id.*). She also claimed that the government double-counted the $350,000, without explaining how, and asked the court to exclude $700,000 from her loss amount. (*Id.*).

Ms. Mollica's counsel repeated the objection at sentencing and urged the court to vary downwardly from the guideline range set by the high loss amount. Counsel emphasized how Ms. Mollica only pocketed $1.7 million of the $11 million total loss, apparently abandoning the "less than $1,000,000" amount asserted in her filed objections. Counsel believed that the $11 million loss amount overstated the seriousness of the offense and Ms. Mollica's involvement in the entire fraud. He then cited Sentencing Commission commentary, an ABA journal, and case law that he claimed should persuade the court to vary downwardly because of the disparity between what Ms. Mollica pocketed and the PSR loss amount. (Crim. Doc. 89 at 32–35).

The court pushed back and asked Ms. Mollica's counsel "about all the other

millions that she was responsible for shifting from their intended use to uses made of them by Mr. Dunning and others with his various businesses." (Crim. Doc. 89 at 39–40). Counsel conceded the point and agreed that Ms. Mollica stipulated to the $11 million loss in the plea agreement, but he again argued that the court "ought to take into consideration what an individual profited off of and not use the whole eleven million in a variance or in a departure situation to say, okay, you took it all, therefore, you should be punished for the entire amount." (*Id.* at 40).

The court told counsel that it understood the basis for his objection because of the Sentencing Commission's concerns about the excessive sentences the fraud loss rules recommend in some cases. But the court reminded counsel that it could consider several other factors in determining whether the loss calculation resulted in an excessive guideline sentence, including the "amount that she was participating in and was responsible for assisting other people in diverting from the intended purpose." (Crim. Doc. 89 at 41).

Counsel then moved to his objection to the $350,000 transaction and the supposed doubled-counting of that amount. He repeated that the government should not attribute the $350,000 to Ms. Mollica because Mr. Dunning sent it to her only to hold it for him. And counsel argued, without evidence, that the government counted the $350,000 amount twice in reaching the $1.7 million

figure.  (Crim. Doc. 89 at 42–43).  The AUSA informed counsel that the

spreadsheet it filed under seal showing how the government calculated $1.7

million did not include any $350,000 or $700,000 transaction.  (*Id.* at 64–65).  Ms.

Mollica's counsel did not raise the issue again.

Then, when imposing sentence, the court *agreed* with Ms. Mollica's

counsel's concerns about the Guidelines loss amount rules when considering that

Ms. Mollica only pocketed $1.7 million of the $11 million.  The court stated:

> We have someone who admitted being a vital player in an
> eleven million dollar fraud of money that was destined to help poor
> people obtain health care.  And the diversion of that money interfered
> with that very needed cause in Alabama.
>
> But then she only pocketed one point seven million dollars of
> the eleven.  To think of that being a minor factor just kind of blows
> my mind.
>
> But I also have expressed this concern before, and I'm not the
> only judge who's had concern, that the guidelines in calculating the
> offense level based upon loss amounts, that they're kind of askew.
> Two hundred ninety-two months for the financial fraud, and that's
> twenty-four years, that's a heck of a long time to spend in prison for a
> nonviolent offense.
>
> And so another starting place for me is disagreement with the
> guideline calculations.  And I do find that the guideline range in this
> case was properly calculated and the guidelines are a starting point,
> but they are not mandatory and this is one time that I'm glad that
> they're not because twenty-four years, as I said, I just think is very out
> of line.

(Doc. 89 at 82).  So, contrary to her Claims 24 and 26, the court *did* explain its

findings on her objection to the loss amount.

In addition, Ms. Mollica's "relevant conduct" for purposes of the loss amount "include[d] all reasonably foreseeable acts and omissions of *others* in furtherance of the conspiracies." *United States v. Moran*, 778 F.3d 942, 975 (11th Cir. 2015) (emphasis added) (citing U.S.S.G. § 1B1.3(a)(1)(B)). So, her loss amount appropriately included the actual or intended loss of the entire conspiracy.

No evidence of double-counting exists, and, though the PSR correctly calculated the loss amount, the court explained its findings on—and ultimately agreed with—the basis for Ms. Mollica's objection to the loss amount rules as applied to her. The court will DENY Claims 24 and 26 on these alternative grounds.

### 12. *Error in Indictment - Lack of Proof of Receipt of Federal Funds (Claim 25)*

Ms. Mollica challenges the role that federal health care funds played in her criminal case with Claims 25 and 27. She directs Claim 25 at the indictment and Claim 27 at the PSR. The court first addresses Claim 25 and addresses Claim 27 below.

Ms. Mollica contends that the government, in the indictment, "did not prove any funds received by Movant from Synergy Medical Solutions Inc. (a private company) or Synergy Real Estate Holdings LLC (a private company) were federal

funds." (Doc. 1 at 16, Claim 25). The collateral-attack waiver bars Claim 25 as a challenge to her conviction. *See Moss*, 2012 WL 1850867, at *5 (collateral-attack waiver bars claims of indictment errors in a § 2255 petition).

Also, Federal Rule of Criminal Procedure 12(b)(2) "clearly provides that '[d]efenses and objections based on defects in the indictment' must be raised before trial." *Ramirez*, 324 F.3d at 1227. Ms. Mollica did not raise her challenges to the indictment before trial. And because she "assert[s] a defense 'based on defects in the indictment' that was," in Ms. Mollica's view, "clear from the face of the indictment," she "waived this issue by failing to raise it in a pretrial motion." *Id.* at 1227–28.

Alternatively, Claim 25 fails on the merits because the indictment did not charge Ms. Mollica with any offense that would require proof of receipt of federal funds to convict her. A wire fraud conviction would require proof that Ms. Mollica "devise[d] . . . any scheme or artifice to defraud" and "transmit[ted] or cause[d] to be transmitted by means of wire, . . . signals . . . for the purpose of executing such scheme." 18 U.S.C. § 1343; (*see* Crim. Doc. 1 at 8). A mail fraud conviction would require proof that Ms. Mollica, "for the purpose of executing such scheme or artifice," mailed "any matter or thing." 18 U.S.C. § 1341; (*see* Crim. Doc. 1 at 11, 24). A money laundering conviction would require proof that

Ms. Mollica conducted a financial transaction designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" or "knowingly engage[d] . . . in a monetary transaction in criminally derived property of a value greater than $10,000."  18 U.S.C. §§ 1956(a)(1)(B)(i), 1957(a); (*see* Crim. Doc. 1 at 17, 20).  And the aggravated identify theft and filing false tax returns offenses do not involve the receipt of funds or perpetuating a fraudulent scheme to receive funds.  *See* 18 U.S.C. § 1028A; 26 U.S.C. 7206(1); (Crim. Doc. 1 at 25–32).  So, to convict Ms. Mollica of any offense alleged in the indictment, the government would not have to prove receipt of federal funds.

Further, the court again construes her petition liberally and presumes that Ms. Mollica intended to also challenge federal jurisdiction over her wires, mailings, and money transactions.  But the court's jurisdiction flows from the "interstate commerce" prong of the wire fraud, mail fraud, and money laundering statutes.  *See* 18 U.S.C. §§ 1341, 1343, 1956(c)(4).  Congress's constitutional authority to regulate interstate commerce granted it legislative jurisdiction to enact those statutes, which, in turn, granted the district courts the jurisdiction over the prosecution of violations of those statutes.  *See* 18 U.S.C. § 3231; *Hasner*, 340 F.3d at 1270; *Oliveros*, 275 F.3d at 1303; *Pemberton*, 2014 WL 5112045, at *3.

And the indictment specifically states that Ms. Mollica's activities affected interstate commerce, so the court had proper jurisdiction. (*See* Crim. Doc. 1 at 8, 11, 17, 20).

The court will DENY Claim 25 on these alternative grounds.

### 13. *Improper Guideline Range Enhancement - Federal Health Care Offense (Claim 27)*

Ms. Mollica contends that the PSR had no basis to assess a 2-point offense level enhancement for committing a "federal health care offense" under the Sentencing Guidelines because her "employer was a privately held company and [the] government had not proven any funds received by [her] employer were designated as federal healthcare funds." (Doc. 1 at 16, Claim 27). The collateral-attack waiver bars Claim 27 as a challenge to her sentence. *Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Sentencing Guidelines enhancements in a § 2255 petition).

Alternatively, Claim 27 fails on the merits because the fact that Ms. Mollica worked for a private company has no bearing on the "federal health care offense" enhancement under the Sentencing Guidelines. The Sentencing Guidelines require a 2-level enhancement for a "[f]ederal health care offense involving a Government health care program" causing a loss to the government health care program between $1 million and $7 million. U.S.S.G. § 2B1.1(b)(7)(i). A "federal health

care offense" includes mail fraud and wire fraud related to a "health care benefit program." 18 U.S.C. § 24(a)(2); *see* U.S.S.G. 2B1.1, Application Note 1 ("'[F]ederal health care offense' has the meaning given that term in 18 U.S.C. § 24."). And a "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

Here, BHC and CACH received federal grant funds from the United States Department of Health and Human Services' Health Resources & Services Administration to provide health care benefits to the poor and homeless, and thus are health care benefit programs under 18 U.S.C. § 24(b). (*See* Crim. Doc. 25 at 7). Ms. Mollica stipulated that she used fraudulent misrepresentations, mailings, wires, and communications to divert those funds to Synergy and IHSA and ultimately enrich herself. (Crim. Doc. 25 at 9–11). Thus, Ms. Mollica stipulated to facts constituting mail and wire fraud related to a "health care benefit program" and committed a "federal health care offense" under U.S.S.G. § 2B1.1(b)(7)(i) and 18 U.S.C. § 24. So, the federal health care offense enhancement was appropriate.

The court will DENY claim 27 on these alternative grounds.

### 14.    *Improper Guideline Range Enhancement - Acting on Behalf of a Charitable Organization (Claim 28)*

Ms. Mollica contends that the court improperly assessed an increase in offense level under the Sentencing Guidelines for misrepresenting that she was acting on behalf of a charitable organization because she "worked at a private company during the entire time of the allegations." (Doc. 1 at 16, Claim 28). The collateral-attack waiver bars Claim 28 as a challenge to her sentence. *Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

Alternatively, Claim 28 fails on the merits because the fact that Ms. Mollica worked at a private company is irrelevant to the "acting on behalf of a charitable organization" enhancement under the Sentencing Guidelines. The Guidelines require a 2-level increase in offense level if the defendant misrepresented that she was acting for the benefit and on behalf of a charitable organization when, in fact, "the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain)." U.S.S.G. § 2B1.1(b)(9)(A), and Application Note 8. The Guidelines do not exempt defendants who work for a private company.

And the court appropriately assessed the enhancement because Ms. Mollica stipulated to facts establishing that she acted on behalf of a charitable organization. BHC is a charitable organization because it is a non-profit organization that

provides no-cost and low-cost health services to homeless and impoverished people. (Crim. Doc. 25 at 7). CACH is a charitable organization because it is a non-profit organization that provides access to primary and preventative health care to people without regard to their ability to pay. (*Id.*). And Ms. Mollica admitted in the plea agreement that she made misrepresentations to and concealed information from HRSA on behalf of BHC and CACH so that HRSA would continue to fund the organizations, when, in fact, she intended to divert those funds for herself. (*Id.* at 9–10). Thus, the "acting on behalf of a charitable organization" enhancement was appropriate.

The court will DENY Claim 28 on these alternative grounds.

### 15. *Improper Guideline Range Enhancement - Sophisticated Means (Claim 29)*

Ms. Mollica contends that the court improperly assessed an increase in offense level under the Sentencing Guidelines for committing an offense involving sophisticated means because "only checks were written and deposited." (Doc. 1 at 16, Claim 29). The collateral-attack waiver bars Claim 28 as a challenge to her sentence. *See Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

Alternatively, Claim 29 fails on the merits because Ms. Mollica stipulated to facts establishing the basis for the "sophisticated means" enhancement under the

Sentencing Guidelines.  The Guidelines require a 2-level increase in offense level

if the offense "involved sophisticated means and the defendant intentionally

engaged in or caused the conduct constituting sophisticated means."  U.S.S.G.

§ 2B1.1(b)(10)(C).  The Application Notes define "sophisticated means" as

"especially complex or especially intricate offense conduct pertaining to the

execution or concealment of an offense."  U.S.S.G. § 2B1.1, Application Note 9.

For example, "hiding assets or transactions, or both, through the use of fictitious

entities, corporate shells, or offshore financial accounts also ordinarily indicates

sophisticated means."  *Id.*  For criminal schemes involving several members, as in

Ms. Mollica's case, "[t]here is no requirement that each of a defendant's individual

actions be sophisticated in order to impose the enhancement.  Rather, it is

sufficient if the totality of the scheme was sophisticated."  *United States v.*

*Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010).

Here, Ms. Mollica did not just write and deposit checks.  Rather, as the PSR

noted and as she stipulated in the plea agreement, she transferred at least $11

million in federal grant funds, assets, and property between entities using a variety

of accounts and financial transactions disguised to appear legitimate.  She also

worked in concert with a CEO, comptroller, grant writer, and human resources

director to perpetrate the scheme.  (Crim. Doc. 25 at 9–13; PSR at ¶ 80).  Though

Ms. Mollica may have only "written and deposited checks" in some instances, the total scheme used quite sophisticated means to defraud HRSA, divert federal funds to private entities, conceal the nature of those transactions, and then launder the funds to enrich Ms. Mollica and others. *See United States v. Campbell*, 491 F.3d 1306, 1315–16 (11th Cir. 2007) (tax fraud offenses involved sophisticated means because the defendant used campaign accounts and credit cards issued to other individuals to conceal fraud). Thus, the "sophisticated means" enhancement was appropriate.

The court will DENY Claim 29 on these alternative grounds.

### 16. *Improper Guideline Range Enhancement - Abusing a Position of Trust (Claim 30)*

Ms. Mollica contends that the court improperly imposed an increase in offense level under the Sentencing Guidelines for abusing a position of trust because she asserts that she "worked for a private company during the entire time of these allegations." (Doc. 1 at 16, Claim 30). The collateral-attack waiver bars Claim 30 as a challenge to her sentence. *Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

Alternatively, Claim 30 fails on the merits because the "abuse of trust" enhancement applies to positions of public *and* private trust. The Sentencing

Guidelines require a 2-level increase if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  And the Application Notes provide that a position of trust is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" because "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  *Id.*, Application Note 1.

Here, Ms. Mollica served as CFO for BHC, performed fiscal duties for and had access to CACH's books, had multiple bank accounts and signatory authority for BHC and CACH, and later became CFO for Synergy.  (PSR at ¶ 83; Crim. Doc. 25 at 8–13).  Accordingly, she had substantial professional and managerial discretion and the court appropriately assessed an enhancement for abuse of a position of trust.

The court will DENY Claim 30 on these alternative grounds.

### 17. *Improper Guideline Range Enhancement - Manager or Supervisor (Claim 31)*

Next, Ms. Mollica challenges her offense level enhancement for being a manager or supervisor of a criminal activity.  She contends that she could not have managed the criminal activity of a named participant, Sheila Parker, because Ms.

Parker worked at a different company. (Doc. 1 at 16, Claim 31). The collateral-attack waiver bars Claim 31 as a challenge to her sentence. *Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

In addition, Claim 31 lacks merit because Ms. Mollica did not need to supervise Sheila Parker's workplace to qualify as a manager or supervisor of criminal activity. The Sentencing Guidelines require a 3-level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). A defendant is a manager or supervisor if, "for example, he recruits others to make his criminal scheme more effective, sets the prices to be paid for the illegal services, and pays his co-conspirators while keeping a larger portion of the profits for himself." *United States v. Hill*, 783 F.3d 842, 846–47 (11th Cir. 2015) (citing *United States v. Njau*, 386 F.3d 1039, 1041 (11th Cir. 2004)). And the defendant need only supervise one of the at-least-five participants to qualify for the enhancement. *Moran*, 778 F.3d at 979 (citing U.S.S.G. § 3B1.1).

Here, Ms. Mollica managed and supervised Sheila Parker by directing her to use her authority as comptroller for CACH to write fraudulent checks. (*See* PSR at ¶ 84); *Hill*, 783 F.3d at 847 (manager or supervisor enhancement was appropriate

for defendant who recruited people in his criminal scheme and directed their services). And the scheme involved five participants: Ms. Mollica, Ms. Parker, Jonathan Dunning, Donyetta Foster, and Sharon Waltz. (*Id.*). Although Ms. Mollica contends that the government did not convict all five participants, the government does not need to secure at least five convictions for the enhancement to apply. *See* U.S.S.G. § 3B1.1, Application Note 1 ("A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."). So, the court appropriately determined the "manager or supervisor" enhancement applied.

The court will DENY Claim 31 on these alternative grounds.

### 18. *Improper Guideline Range Enhancement - Obstruction of Justice (Claim 32)*

Ms. Mollica contends that the court improperly imposed an increase in offense level under the Sentencing Guidelines for obstruction of justice because she was never *convicted* of obstruction of justice. (Doc. 1 at 16, Claim 32). The collateral-attack waiver bars Claim 32 as a challenge to her sentence. *Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

In addition, Claim 32 fails on the merits because the 2-level increase for "obstructing or impeding the administration of justice" does not require a

conviction.  U.S.S.G. § 3C1.1.  Rather, it requires that a defendant willfully

obstruct "the administration of justice with respect to the investigation,

prosecution, or sentencing of the instant offense of conviction."  *Id.*  And

defendants can obstruct justice in several different ways.  *See, e.g.*, *id.*, Application

Note 4 (listing intimidating a co-defendant or witness, failing to comply with a

court order, and more, as examples of obstruction of justice); *United States v.*

*Watts*, 896 F.3d 1245, 1255 (11th Cir. 2018) (defendant obstructed justice by

modifying his tattoos to not match the description of a bank robbery suspect);

*United States v. Hesser*, 800 F.3d 1310, 1331 (11th Cir. 2015) (defendant

obstructed justice by attempting to influence his wife's testimony); *United States v.*

*Perkins*, 787 F.3d 1329, 1341 (11th Cir. 2015) (defendant obstructed justice by

failing to appear in court, ignoring court procedures by filing *pro se* motions while

he had counsel, and delaying and disrupting court proceedings); *United States v.*

*Dougherty*, 754 F.3d 1353, 1361 (11th Cir. 2014) (defendant obstructed justice by

attempting to escape custody before trial).

 Here, Ms. Mollica indisputably committed "obstructive conduct related to

[her] offense of conviction."  While on pre-trial release, she sent drugs to the

husband of the AUSA on her case and attempted to frame him for distributing

drugs to students.  She sent drugs and digital scales to her co-conspirator's house in

an attempt to intimidate and/or frame her. She also sent gift cards to the FBI agent and AUSA on her case and then reported them for stealing from her. (PSR at ¶ 109). So, the court appropriately awarded her an enhancement for obstruction of justice.

The court will DENY Claim 32 on these alternative grounds.

### 19. *Duplicitous Counting of Enhancements (Claim 33)*

Ms. Mollica contends that the PSR inappropriately applied the 2-level increase for obstruction of justice to each group of charges, thereby subjecting her to duplicitous counting of offense level enhancements. (Doc. 1 at 16, Claim 33). The collateral-attack waiver bars Claim 33 as a challenge to her sentence. *See Frye*, 402 F.3d at 1129 (collateral-attack waiver bars challenges to the application of Guidelines enhancements in a § 2255 petition).

Alternatively, Claim 33 fails on the merits. The Sentencing Guidelines require the court to combine "[a]ll counts involving substantially the same harm . . . into a single Group," and then "[d]etermine the offense level applicable to each of the Groups" according to the same rules that the court must follow when determining the offense level for a single count. U.S.S.G. §§ 3D1.2, 3D1.3. The PSR, which the court adopted, properly did just that.

The PSR combined the mail fraud, wire fraud, and money laundering counts

into one Group and then found that Ms. Mollica obstructed justice with respect to that Group. (PSR at ¶ 85). The PSR then combined the filing false tax returns counts into one Group and found that Ms. Mollica obstructed justice as to that Group. (*Id.* at ¶ 91). Then the PSR combined the life insurance mail fraud counts into one Group and found that Ms. Mollica obstructed justice as to that Group. (*Id.* at ¶ 97).

So, Ms. Mollica is correct that an obstruction of justice enhancement applied to three groups of Counts, but she is incorrect that the enhancements violated the law. The same enhancements in Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines, which includes obstruction of justice, can apply to separate groups of offenses. *See* U.S.S.G. §§ 3D.1.1(a)(2), 3D1.3(a) (requiring courts to apply certain enhancements to each group independent of enhancements in other groups); *see also United States v. Abram*, 171 F. App'x 304, 316 (11th Cir. 2006) (rejecting defendants' argument that multiple counts should have been grouped under U.S.S.G. § 3D1.2 because each count involved the same enhancements); *United States v. Faris*, 2013 WL 3797339, at *2 (N.D. Fla. July 19, 2013) (false testimony given at trial supported adjustment for obstruction of justice for two separate counts). So, the court did not impermissibly double-count any enhancements.

And, even if the court had applied the obstruction of justice enhancement only to Group 1, Ms. Mollica's total offense level of 40 would have remained the same.  The adjusted offense level for Group 1 would have been 40.  (*See* PSR at ¶ 86).  The adjusted offense levels for Groups 2 and 3 would have been 22 and 19, respectively.  (*See id.* at ¶¶ 92, 98).  So, the highest offense level would have been 40, no increase in offense level would apply under U.S.S.G. § 3D1.4, no Chapter Four enhancement would apply, and no acceptance of responsibility reduction would apply, resulting in a total offense level of 40.  (*See* PSR at ¶ 106).  So, even if the court had double-counted enhancements, Ms. Mollica would have suffered no harm and the court would not have committed error.  *See United States v. Sarras*, 575 F.3d 1191, 1220 n.39 (11th Cir. 2009) (finding that the district court did not err in applying a two-level enhancement because, "[i]n any event, any alleged error in applying the two-level enhancement was harmless because Sarras's total offense level would have remained the same").

In addition, at the sentencing hearing, the court "conclude[d] that the sentence imposed would have been the same regardless of how the guidelines issues had been resolved."  (Crim. Doc. 89 at 90).  So, again, Ms. Mollica's sentence would have been the same even if the court endorsed her preferred application of the guidelines enhancements.

The court will DENY Claim 33 on these alternative grounds.

### 20.    *Upward Departure at Sentencing (Claim 34)*

Ms. Mollica contends that the court violated her due process rights by departing upwardly from the guideline range.  (Doc. 1 at 17, Claim 34).  The written plea agreement expressly exempts this claim from the collateral-attack waiver, but the claim lacks merit because the court did *not* depart upwardly.  (*See* Crim. Doc. 25 at 21).

At the sentencing hearing, after adopting the factual statements contained in the PSR, the court found that Ms. Mollica's offense level was 40 and her criminal history category was one.  (Crim. Doc. 89 at 27).  Thus, her guideline advisory range was 292 to 365 months' imprisonment, *plus* a *mandatory* consecutive 24 months for the aggravated identity theft count.  (*Id.*).

But, for the several reasons stated at the sentencing hearing, and as discussed in detail below for Ms. Mollica's final attack on the court's sentencing explanation, the court sentenced Ms. Mollica to 180 months plus the mandatory 24 months, for a total of 204 months (or 17 years).  Although the sentence was five years longer than what Ms. Mollica would have received had she complied with the plea agreement, the sentence was *seven years less* than the low end of her advisory guideline range.  (Crim. Doc. 89 at 86).  So, the court did *not* depart upwardly;

rather, it substantially varied *downwardly*.

The court will DENY Claim 34 as frivolous.

### 21. *Failure to Explain Sentence and the § 3553(a) Factors (Claim 43)*

Finally, Ms. Mollica contends that the court failed to explain its sentencing decision and the record is "insufficient to determine whether [the] 18 U.S.C. [§] 3553(a) factors were considered." (Doc. 1 at 18, Claim 43). The collateral-attack waiver bars Claim 43 as a challenge to her sentence. *See Barrington*, 648 F.3d at 1197 (collateral-attack waiver bars challenges to the court's justification for the sentence imposed in a § 2255 petition); *Allen*, 2016 WL 5376289, at *4 (collateral-attack waiver bars challenges to the court's balancing of the 18 U.S.C. § 3553(a) factors).

Alternatively, Claim 43 fails on the merits because the court thoroughly explained its reasoning for fashioning Ms. Mollica's sentence and even restated its rationale within the framework of the § 3553(a) factors. (Crim. Doc. 89 at 81–90). She may disagree with her sentence, but that does not mean her sentence violated the law.

The court began its sentencing explanation by questioning the appropriateness of the Sentencing Guidelines' loss amount enhancement as applied to Ms. Mollica. The court focused on the disparity between the total loss that the

fraud caused and what Ms. Mollica actually pocketed:

> We have someone who admitted being a vital player in an eleven million dollar fraud of money that was destined to help poor people obtain health care. And the diversion of that money interfered with that very needed cause in Alabama.

> But then she only pocketed one point seven million dollars of the eleven. To think of that being a minor factor just kind of blows my mind.

> But I also have expressed this concern before, and I'm not the only judge who's had concern, that the guidelines in calculating the offense level based upon loss amounts, that they're kind of askew. Two hundred ninety-two months for the financial fraud, and that's twenty-four years, that's a heck of a long time to spend in prison for a nonviolent offense.

(Crim. Doc. 89 at 82).

The court considered it unreasonable and inconsistent with the statutory purposes of sentencing to sentence Ms. Mollica to 24 years based on the loss amount enhancement when the court "had some very violent offenders that weren't looking at that kind of time in prison." (*Id.*). And the court stated that a 24-year sentence for Ms. Mollica would not be a proper use of taxpayer dollars. So the court decided that a substantial downward variance from the guideline range was appropriate.

Then the court looked at how the government would have recommended 120 months, as opposed to 292 months, had Ms. Mollica complied with the plea

agreement.  So, the court considered a sentence between 216 and 230 months as a mid-range sentence.  (Crim. Doc. 89 at 83).

Then the court returned to Ms. Mollica's continuing criminal conduct and failure to accept responsibility:

> But then I kept coming back to, but she did not fully accept responsibility in this case, she did not stop her criminal conduct and she did, in fact, take steps to obstruct justice and certainly interfered with the lives of about a handful of people, roughly, to -- for whatever end she was seeking, whether it was to get the prosecution team arrested or embarrassed or the charge dropped or whatever.
>
> But that certainly shows a calculating and vindictive person and not someone accepting responsibility.  So that made me think, well, that range may not be enough.

(Crim. Doc. 89 at 84–85).

Based on those factors, and "recognizing that this is not just a straight run-of-the-mill financial fraud case, it's much more complex than that, with a lot of intricacies to it," the court considered that a 15-year sentence might be reasonable for the financial fraud offenses, which would be half the statutory maximums.

So, the court imposed a sentence of 180 months plus the mandatory 24 consecutive months for the identity theft count, for a total sentence of 204 months or 17 years.  (Crim. Doc. 89 at 86).

The court then explained its sentencing decision within the framework of the 18 U.S.C. § 3553(a) factors.  As shown below, it specifically considered "the

102

nature and circumstances of the offense and the history and characteristics of the

defendant"; the need for the sentence to "reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense"; the

need to "afford adequate deterrence to criminal conduct[,] protect the public from

further crimes of the defendant," and rehabilitate the defendant; "the kinds of

sentences available"; the Guidelines offense level; "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found

guilty of similar conduct"; and "the need to provide restitution to any victims of

the offense."  18 U.S.C. § 3553(a)(1)–(7).  The court explained:

> First, the nature and circumstance of this offense.  This is --
> central to this case is the many months, many years over which eleven
> million dollars was, in essence, stolen from government grants that
> were to be used to provide health care for the poor.  When our country
> is in such need of medical treatment for those who do not have
> financial means to obtain it, I find that this conduct is especially
> egregious.

> And then also the fact that although Ms. Mollica was making a
> nice salary, that was not sufficient for her and that she personally stole
> one point seven million dollars.  This is one of the larger financial
> fraud cases I have seen in fifteen years.

> But I have also taken into account the history and
> characteristics of the defendant.  Usually when I'm dealing with a
> defendant with a criminal history category of one, I find a lot of
> reasons to be exceptionally lenient, and I'm sure that the government
> would say unreasonably so at times, but I try with people who have a
> criminal history category of one to see that they have another chance
> to demonstrate that they are, in fact, the good people that their low

criminal history indicates.

But that is not the case here. This is not a one-time crime. This is a crime that Ms. Mollica engaged in over several, several years, dozens and dozens of entries that were necessary to carry out this fraud and to line her pocket. But not only was she engaged in this financial fraud, at the same time, she's defrauding a -- an insurance company when she took out the policy on her brother-in-law without an insurable interest and he -- and then forges a doctor's signature. And then at the same time that she's pleading guilty, she's setting up all these things in motion to, at least at a minimum, cast dispersions on the character of the prosecution team.

So I find that the criminal history category of one does not really reflect the criminal conduct of Ms. Mollica.

The sentence, I believe, reflects the seriousness of the offense. I hope it will promote respect for the law and provide just punishment and afford adequate deterrence to criminal conduct.

Also, I think the sentence is needed to protect the public from further crimes of the defendant. I think her conduct here has demonstrated that, although I usually find that that is not a factor in financial crimes, it certainly is in this case.

I think the punishment will provide her with the best correctional treatment in the most effective manner and avoid unwarranted sentence disparities. And I emphasize unwarranted. I did take into consideration the sentences that were referenced in the defendant's sentencing memo, and I just find in this case that there are some significant disparities from the cases that were listed as comparable.

I have just never seen a situation where a plaintiff actually pled guilty and never really demonstrated, in my opinion, a lack of acceptance of responsibility or any remorse. I have never seen a situation where a defendant pled guilty and then lashed out at the prosecutors and the Federal agent prior to sentencing.

I have seen some situations where afterwards, after a plea, defendants have acted up a bit but never beforehand.

But I have also considered the need to provide restitution to the victims. I do hope that the forfeiture amount will satisfy that. But I don't know.

I do find that the sentence imposed is a reasonable one in light of the guidelines and the factors at 18 U.S.C. Section 3553(a) and I conclude that the sentence imposed would have been the same regardless of how the guidelines issues had been resolved.

(Crim. Doc. 89 at 88–90).

This thorough explanation demonstrates that the court considered *all* of the relevant 18 U.S.C. § 3553(a) factors and reasonably justified Ms. Mollica's sentence. Her claim that the court did not explain itself has no basis in reality. She may disagree with the sentence imposed, ignore how the court significantly varied downwardly from the properly calculated guideline range, and repeatedly complain about the impact of her ongoing criminal conduct, but she cannot meaningfully challenge the lawfulness of her sentence.

The court will DENY Claim 43 as waived and without merit.

## III. CONCLUSION

All of Ms. Mollica's claims fail.

Ms. Mollica's Claim 9 that the court failed to state whether it dismissed several of the counts against her with or without prejudice is moot and otherwise lacks merit, so the court will DENY Claim 9.

The court had jurisdiction over Ms. Mollica's case, so the court will DENY Claim 44.

Ms. Mollica entered her guilty plea and the written plea agreement knowingly and voluntarily, so the court will DENY Claims 2, 7, 11, 35–36, and 39–41.

The government did not breach the written plea agreement, so the court will DENY Claim 3.

Ms. Mollica entered her guilty plea and the written plea agreement with effective assistance of counsel, and received effective assistance of counsel in all other respects, so the court will DENY Claims 4–6, 10, 12, 22, 37–39, 40, and 42.

Finally, Ms. Mollica's substantive challenges to her conviction and sentence are barred by the collateral-attack waiver in her written plea agreement and/or lack merit, so the court will DENY Claims 1, 8, 13–21, 23–34, and 43.

Having denied all claims for relief, the court will DISMISS Ms. Mollica's

§ 2255 petition. The court will enter a separate order consistent with this memorandum opinion.

DONE and ORDERED this 21st day of March, 2019.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT
JUDGE